992 F.2d 1217
 143 L.R.R.M. (BNA) 2936
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
NATIONAL LABOR RELATIONS BOARD, Petitioner/Cross-Respondent,
v.
TECMEC INC., d/b/a/ T.M.I., Respondent/Cross-Petitioner.
 No. 92-5550.
 United States Court of Appeals, Sixth Circuit.
 April 5, 1993.
 
 Before GUY and BOGGS, Circuit Judges, and BELL, District Judge.*
 PER CURIAM:
 
 
 1
 Plumbers and Pipefitters Union, Local 189 ("Union") filed an unfair labor practice charge against Tecmec, Inc., alleging that Tecmec discharged Jeff Apel and Dustan Apel because of their activities in support of union organization, in violation of section 8(a)(1) & (3) of the National Labor Relations Act ("NLRA"). After a hearing, the administrative law judge ("ALJ") found that Tecmec violated NLRA § 8(a)(1) & (3) and ordered appropriate relief, including reinstatement and back pay. The National Labor Relations Board ("Board") adopted the ALJ's recommended order on February 28, 1992, and now applies to this court for enforcement of that order. Tecmec cross-petitions for review of the order. We deny Tecmec's cross-petition for review and grant the Board's application for enforcement.
 
 
 2
 * Tecmec is a nonunionized mechanical contractor with operations in over ten states and a workforce of several hundred employees. Gail Thompson is the founder and president of Tecmec.
 
 
 3
 Three Apel brothers--Joe, Jeff and Dustan--worked for Tecmec in 1989 and 1990. Joe Apel was a foreman at Tecmec who was a former union member and a supporter of unionization at Tecmec. In April 1989, the Union attempted to organize Tecmec's employees at its Sears jobsite near Columbus, Ohio. Joe Apel participated in the campaign by passing out leaflets and authorization cards and talking up the Union. Later that month, Joe Apel and twelve other employees quit Tecmec for jobs with unionized employers.
 
 
 4
 Jeff Apel began working for Tecmec in July 1988. He moved up to helper and then to helper/fitter and received several raises. He consistently received favorable job evaluations. Dustan Apel began working for Tecmec in August 1988 as a helper. He also received favorable job evaluations and raises. Both Dustan Apel and Jeff Apel worked on the Sears jobsite that their brother Joe attempted to organize. Both signed authorization cards. Jeff Apel discussed the Union with employees, supervisors and managers. However, neither Jeff nor Dustan Apel participated in the walkout with Joe Apel.
 
 
 5
 Immediately after the walkout, Gail Thompson met with the remaining employees at the Sears jobsite and urged them not to support the Union. After the meeting, according to Jeff and Dustan Apel, Gail Thompson called Jeff and Dustan aside. He told them that he knew their brother Joe helped instigate the walkout and that he would discharge them if they continued to talk about the Union. Gail Thompson denied having this conversation with the brothers and said that he could not even have recognized them at the time.
 
 
 6
 In September 1990, Jeff and Dustan Apel worked for about two weeks on a job at the Mead Paper Plant in Chillicothe, Ohio. Jeff Apel testified that, on a lunch break, Kelly Thompson, project superintendent and brother of Gail Thompson, and Bob Lovejoy, acting superintendent, pulled up in a truck alongside Jeff Apel. Jeff Apel told them that his brother Joe had a message for Gail Thompson, namely, that the Union planned to send organizers to the Mead jobsite and to target a jobsite in Toledo. Kelly Thompson told Jeff Apel that he did not want to hear anything about the Union. Later that day, according to Jeff Apel, Lovejoy told Jeff Apel that Kelly Thompson was very angry about the message and warned him that he could lose his job if he continued to talk about the Union. Both Kelly Thompson and Lovejoy denied that these conversations or any similar conversations took place.
 
 
 7
 About a week later, Rick Williams, the job foreman, told Jeff Apel that he was being laid off because the work at Mead was winding down. Jeff Apel called Tecmec's Columbus office about being assigned to another job five or six times over the next month, but was always told that Tecmec would call him when work became available. Jeff Apel was never recalled. Jeff Apel had been laid off twice before; such layoffs were not uncommon because there was never a steady amount of work. However, in the past, Jeff Apel had been given a notice announcing the reason for the layoff. This time Jeff Apel received no notice or any explanation of why he was never recalled. Tecmec did place a notice in the company files, stating that Jeff Apel had been "laid off" and was "not eligible for rehire." Although the company policy required an explanation and certain notice procedures for anyone who was "fired," no explanation was given for Jeff Apel's permanent dismissal.
 
 
 8
 Dustan Apel left the Mead jobsite on September 30, 1990 and returned to his previous work at the Litel jobsite on October 4, 1990. On October 5, Superintendent Rich Link told Dustan that he had been instructed to fire Dustan Apel and his brother Jeff. According to Dustan, Link said that Dustan was fired "due to Union organization." Link denied that he told Dustan Apel that he was discharged because of the union activity.
 
 
 9
 Subsequently, Dustan Apel inquired about returning to work. When Link needed additional workers, he asked Vice President Doug Stevenson if he could recall Dustan. Stevenson told Link that he could not, because Dustan and Jeff Apel were suspected of stealing tools. Link asked what reason he should give Dustan for the discharge. Stevenson told Link to give "excessive absenteeism" as the reason for the layoff. Like Jeff, Dustan Apel was not given any written notice as he had in earlier layoffs. Also, like Jeff, a notice was placed in the company files that Dustan had been "laid off" and was "not eligible for rehire." Again, no explanation for the permanent discharge was provided.
 
 
 10
 In December 1990, Jeff Apel and his fiancee, Donetta Sowards, were at a local Ramada Inn and ran into Jim Carnes, a foreman with Tecmec. According to Jeff Apel and Sowards, Carnes told Jeff that Gail Thompson accused the Apel brothers of theft, that Carnes and others knew this was not true, and that the discharge was really prompted by "the Union situation" in Toledo. Carnes also said that Gail Thompson was angry about the organizing efforts and offered to pay someone money to rough up Jeff Apel. Carnes told Jeff Apel that he wanted to get Jeff and Dustan Apel reinstated through Tecmec's Cincinnati office rather than the Columbus office. At the hearing, Carnes gave a very different version of this encounter. He claimed that the conversation took place in October and that it consisted of nothing more than cursory introductions and small talk.
 
 
 11
 Thompson and other representatives of Tecmec claimed that Dustan and Jeff Apel were dismissed because they were suspected of stealing tools from the Mead jobsite. Tools at the Mead jobsite were stored in unlocked storage trailers. Although the Apel brothers had access to the tools, so did the other seventy Tecmec employees as well as other contractors' employees. Tecmec did not uses sign-in sheets or keep any records of who used the tools. Gail Thompson testified that a significant number of tools were stolen from the Mead jobsite, including a generator. Ralph Shaw testified that he did a quick inquiry into the matter and reported that employees had told him the Larry Young and Jeff Apel might be stealing. Shaw also named Dustan Apel as a "possible" suspect. Thompson testified that he did some more research and discovered that tools were missing from other jobs that the Apel brothers worked. He testified that although he had no hard evidence, he was convinced that the Apel brothers had stolen the tools.
 
 II
 
 12
 Section 7 of the NLRA grants employees "the right to self-organization, to form, join, or assist labor organizations, ... and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection...." 29 U.S.C. § 157. The protections of section 7 apply to non-unionized workers as well as unionized workers. N.L.R.B. v. Washington Aluminum Co., 370 U.S. 9, 14 (1962). In section 8(a)(1) of the NLRA, Congress made it unlawful for an employer to interfere with an employee's exercise of the rights guaranteed by section 7. 29 U.S.C. § 158(a)(1). Section 8(a)(3) makes it an unfair labor practice for an employer to discriminate "in regard to hire or tenure of employment or any term or condition of employment to ... discourage membership in any labor organization...."
 
 
 13
 In N.L.R.B. v. Transportation Management Corp., 462 U.S. 393 (1983), the Supreme Court adopted the Board's analysis for determining whether an employer's discharge of an employee violates section 8(a)(1), first articulated in Wright Line, 251 N.L.R.B. 1083 (1980), enf'd, 662 F.2d 899 (1st Cir.1981), cert. denied, 455 U.S. 989 (1982). Under this analysis, the General Counsel has the burden of showing that the employee's exercise of section 7 rights was a substantial or a motivating factor in the employer's decision to discharge the employee. If the employer fails to rebut the General Counsel's argument, the employer still may avoid liability by proving by a preponderance of the evidence that the discharge was also motivated by the employee's unprotected conduct and that the employee would have been discharged even if he had not engaged in the protected conduct. Transportation Management Corp., 462 U.S. at 400.
 
 
 14
 The standard of review is well settled. We will not disturb the Board's findings of fact that are supported by substantial evidence on the record considered as a whole. Roadway Express, Inc. v. N.L.R.B., 831 F.2d 1285, 1289 (6th Cir.1987) (citing Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951)). "When there is a conflict in the testimony, 'it is the Board's function to resolve questions of fact and credibility,' and thus this court ordinarily will not disturb credibility evaluations by an ALJ who observed the witnesses' demeanor." Roadway Express, Inc., 831 F.2d at 1289 (quoting N.L.R.B. v. Baja's Place, 733 F.2d 416, 421 (6th Cir.1984)).
 
 
 15
 This case hinges completely on credibility determinations. The General Counsel's prima facie case is grounded entirely on the testimony of Dustan Apel, Jeff Apel and, Donetta Sowards, concerning a series of conversations in which Tecmec representatives expressed their anti-union animus. All three are interested parties, and no evidence was presented to corroborate their testimony. Tecmec's witnesses provide a very different version of the facts. They deny that some of the crucial conversations even took place and claim other conversations were markedly different. In general, they deny ever talking to Dustan or Jeff Apel about their interests in unionization or about Joe Apel's union activism. When two versions of the same events are as markedly different as these the incongruity cannot be attributed to different perspectives or faded memories. Either Jeff and Dustan Apel fabricated their claims of anti-union animus or Tecmec witnesses lied in denying that the alleged conversations took place.
 
 
 16
 Credibility determinations are generally considered the province of the Board and the ALJ. We will not set aside the Board's choice between conflicting testimony simply because we find Tecmec's version of the facts more credible than the Apels' version of the facts. Instead, we must focus on the Apels' version of the events and only overturn the Board's order if the Apels' testimony is not reasonable in light of the proven facts. Teledyne Industries v. N.L.R.B., 911 F.2d 1214, 1222-23 (6th Cir.1990); N.L.R.B. v. Comgeneral Corp., 684 F.2d 367, 369 (6th Cir.1982). As this court explained in N.L.R.B. v. Paschall Truck Lines, 469 F.2d 74, 76 (6th Cir.1972):
 
 
 17
 In reviewing the credibility findings and inferences drawn by the Board from the evidence, the test for a reviewing court is whether the conclusions are reasonable in light of the proven facts. Thus, this Court may not substitute its judgment on the question whether the inference drawn is the correct one or whether a different inference would be better supported, but is limited to the determination of reasonableness--not rightness.
 
 
 18
 Our deference to the ALJ's judgment in credibility determinations is grounded in the recognition that the ALJ had an opportunity to observe the witnesses firsthand whereas "the reviewing court looks only at cold records." N.L.R.B. v. Walton Manufacturing Co., 369 U.S. 404, 408 (1962). That said, we will not assign to a factual finding "more weight than in reason and in light of judicial experience [it] deserve[s]." Universal Camera, 340 U.S. at 496. "If the record reveals that the [ALJ] has ignored uncontradicted testimony or otherwise abused his discretion in resolving factual issues, this court must not acquiesce in the decision." Hickman Harbor Service v. N.L.R.B., 739 F.2d 214, 218-19 (6th Cir.1984).
 
 
 19
 As stated before, the General Counsel built his case on the testimony of Jeff and Dustan Apel. They both testified that Gail Thompson threatened them with discharge in April 1989 if they continued to talk about the Union. Jeff Apel testified that Lovejoy told him that Kelly Thompson was very angry at him for speaking about the Union and his brother's involvement in September 1990 and warned him that he was running a risk of being fired. Shortly after that conversation, Jeff Apel was "laid off" and declared "not eligible for rehire" without any explanation. Dustan Apel was fired the same day by Link. He testified that Link told him that he was fired because of the union activity. Like Jeff, Dustan did not receive a discharge notice nor was any explanation provided in the company files for why he was "not eligible for rehire." Finally, Jeff Apel testified that Carnes told him in December 1990 that Dustan and Jeff were falsely charged with stealing tools and that he thought that the real reason for their dismissal was their brother Joe's involvement with the Union. Donetta Sowards corroborated Jeff Apel's testimony about the conversation with Carnes.
 
 
 20
 This testimony is not corroborated with any testimony from an uninterested party or demonstrative evidence other than the company files confirming the Apels' permanent discharge. The only circumstantial evidence is the fact that the discharges coincided with Joe Apel's attempts to organize a Tecmec jobsite in Toledo. On the other hand, Gail Thompson denied that he ever had a conversation with the Apels about the Union and claimed that he had no animosity against unions. Kelly Thompson and Link denied that they ever had any conversations with the Apels about the union. Finally, Carnes admitted speaking with Jeff Apel about coming back to work at Tecmec, but denied that he discussed the reasons for the dismissals.
 
 
 21
 The ALJ reviewed all of the evidence and recognized both the Apels' and Tecmec's testimony. The ALJ determined that the Apels' testimony was credible and supported an inference that the discharges were motivated by anti-union animus and discussed the reasons for his credibility determinations at length. Had we been in the shoes of the ALJ and had the advantage of observing the witnesses ourselves, we may have decided this case differently. We do not review the ALJ's findings de novo, however. From our vantage point, there is nothing in the "cold record" before us that convinces us that the ALJ's credibility determinations were unreasonable or unsupported by the evidence. Accordingly, we will not disturb the ALJ's findings.
 
 
 22
 Tecmec challenges the ALJ's credibility determinations primarily by claiming that the ALJ mischaracterized defense counsel's questions on direct examination as leading and therefore refused to consider the answers. In particular, Tecmec objects to the following passage from the ALJ's report:
 
 
 23
 In addition to these circumstances, I also have considered that much of the company witnesses [sic] critical testimony was generated in the form of a direct leading question by Respondent's counsel in which the witness merely denied the statement in the question, a statement which generally related to something mentioned by the General Counsel's witnesses in their testimony. This type of questioning does little to enhance any inherent reliability in the answer which follows and I find that the testimony of the company supervisors that conflicts with that of the other witnesses discussed below is not persuasive or credible.
 
 
 24
 In its brief, Tecmec argues at great length that the questions were not leading. Tecmec's argument misses the point. First, the ALJ discussed the "leading questions" at the end of his analysis as a consideration "[i]n addition to [other] circumstances." Second, even if we agreed with Tecmec that the questions were not leading, this would not add more credibility to the testimony. The issue is not whether the questions were permissible; the ALJ allowed the questions to be asked. The issue is one of credibility. Tecmec's counsel prompted testimony on the critical issues of this case by asking "yes or no" questions. The ALJ's point was that it is easy for a witness to answer a "yes or no" question without contradicting himself or other witnesses. However, the drawback of this strategy is that it does not allow any insight into the credibility of the witness. The ALJ's credibility decision remains unaffected.
 
 
 25
 Next, Tecmec argues that the ALJ misconstrued or disregarded the requirements of Fed.R.Evid. 609(a)(1). Jeff Apel was convicted of sexual battery. While in prison, he pled guilty to having committed aggravated riot. Under Fed.R.Evid. 609(a)(1),
 
 
 26
 evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year....
 
 
 27
 Rule 609(a)(1) applies in a civil as well as a criminal context. Green v. Bock Laundry Machine Company, 490 U.S. 504 (1989).
 
 
 28
 In considering Jeff Apel's credibility, the ALJ stated:
 
 
 29
 Jeff Apel's testimony is said to be unbelievable because he served time for a felony conviction. As noted in the General Counsel's argument, the type of crime involved in unrelated to truthfulness and otherwise, the witness readily admitted his conviction as well as the indictment that occurred while in prison and his understanding of what occurred.
 
 
 30
 Tecmec contends that the ALJ misconstrued the requirements of Fed.R.Evid. 609(a)(1) or confused the rule with Fed.R.Evid. 609(a)(2), which allows impeachment by way of any conviction, regardless of punishment involved, if the crime "involved dishonesty or false statement."
 
 
 31
 There is nothing in the record to suggest that the ALJ was unaware of the requirements of Fed.R.Evid. 609(a)(1), or that he failed to admit evidence of Jeff Apel's convictions for purposes of impeachment. Rather, the ALJ concluded that such evidence did not impeach Apel's credibility. Fed.R.Evid. 609(a)(1) does not mandate that, upon the introduction of evidence that a witness committed a felony, the witness's testimony is to be automatically and completely discredited. The ALJ noted that Tecmec's own evaluations of Jeff Apel included comments that "he is quiet and causes no problems or distractions." In light of Apel's work history and the fact that his convictions were not for crimes involving dishonesty or false statements (such as fraud, embezzlement and perjury), the ALJ did not commit clear error in deciding that Apel did not lack credibility because of his criminal history.
 
 
 32
 Finally, Tecmec provided very little evidence that the primary motivation for the discharge was the tool-stealing. Tecmec provided no evidence that the Apels stole any tools other than vague references to employee gossip; nor did it press charges, notify the police, refer to the charges in the discharge notices, or challenge the Apels' applications for unemployment benefits. Also, the employee evaluations show that both brothers were considered reliable workers. Finally, Larry Young was also accused of stealing from the Mead jobsite. In fact, he was accused of stealing a generator--a high-cost item. Yet, a very different procedure was followed. Gail Thompson confronted Young with the charges and gave him a chance to return the generator he allegedly stole with no repercussions. Also, Tecmec circulated a memo explaining the charges against Young and that he was indefinitely suspended pending investigation.
 
 III
 
 33
 For the foregoing reasons, we GRANT the application for enforcement and DENY the cross-petition for review.
 
 
 
 *
 The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation