NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

COMGENERAL CORPORATION,
Respondent.

No. 81–1308.

United States Court of Appeals,
Sixth Circuit.

Argued May 21, 1982.

Decided July 29, 1982.

Elliott Moore, Daniel Pollitt, Deputy Associate Gen. Counsels, N.L.R.B., Washington, D. C., for petitioner.

Thomas M. Green, Green & Green, Dayton, Ohio, for respondent.

Before ENGEL and CONTIE, Circuit Judges, and WEICK, Senior Circuit Judge.

PER CURIAM.

This is a petition of the National Labor Relations Board, pursuant to Section 10(e) of the National Labor Relations Act, as amended, 29 U.S.C. § 151 *et seq.*, for enforcement of its order of August 27, 1980. The Board found that the respondent violated Section 8(a)(1) and Section 8(a)(3) and (1) of the Act. The Board's order requires the respondent to cease and desist from the unfair labor practices and requires the respondent to offer ten discharged employees full and immediate reinstatement without prejudice to seniority or other rights previously enjoyed and to make the discharged employees whole for any loss of pay or benefits incurred as a result of the unfair labor practices. The Board's decision is reported at 251 NLRB No. 69.

The respondent is engaged in the manufacture of an electronic device, known as

"the Fox", which is used in motor vehicles to detect police radar signals. Production of the radar detector commenced on a limited basis in June, 1976, at the Taylorsville Road plant. As production increased, the respondent began to contract out the manufacturing of certain parts. And, in August 1978, the respondent acquired a second plant (Webster Street Plant) and moved the electronic assembly and testing operations to that location.

Between the period October 1978, and January 19, 1979, union organizing activities occurred at the Webster Street plant by the International Association of Machinists & Aerospace Workers Union. During this time, in late November or early December, Mr. Roettele, President of ComGeneral Corporation, addressed assemblies of employees of the Taylorsville Road plant stating that the union might want to come to that plant too. He then stated that the employees did not need a union because they would get any increases that were granted to Webster Street plant employees. Roettele also stated that if the union did come in he would either close the plant and go elsewhere or close the plant and reopen it later. On January 19, 1979, the International Association of Machinists and Aerospace Workers Union won election at the Webster Street plant.

Also during this period, on January 15, 1979, the respondent contracted out its tube assembly work (a component part of the radar detector) which comprised about 75 percent of the work at the Taylorsville Road plant. The reason for this sub-contract with the Stanhope Products Company was that Stanhope could produce the tube assemblies at a cost of $2.07 per unit whereas the respondent was producing the units at a cost of $4.73 each. Production of the tube assemblies at the Taylorsville Road plant, however, did not terminate until mid-April 1979, when the first shipment of these units was received. Once the tube assemblies began to arrive, additional work from the Webster Street plant was transferred to the Taylorsville Road plant.

On April 30, 1979, Taylorsville Road employees began to investigate the possibility of unionization. Conversations of union activities occurred at work among employees in close proximity to Foreman Leo Brennan and Supervisor Shirley Hicks. And, one employee requested Supervisor Hicks to arrange a meeting between Mr. Roettele and the Taylorsville Road employees in regard to employee-employer relations. On May 1, 1979, the employees contacted the International Union of Electrical, Radio and Machine Workers, Local 804.

On May 2, 1979, Mr. Roettele ordered an immediate reduction in force and that the best 10 or 12 full-time employees should be retained. The personnel director, Mr. Broadstone, selected eight employees for discharge on the basis of tardiness, excessive absence and/or related delinquencies. Two employees protested, asserting that their absences were excused and thereby convinced Broadstone to reconsider their discharge. On the following day these two employees were also discharged.

On May 3, 1979, employee Huffman returned to work after receiving information that he was to report to work a day before a three-day suspension ended. Upon reporting to work, personnel director Broadstone met Huffman. Broadstone said he was going to fire Huffman but because Huffman returned to work he told him to go ahead and work. Later that day, however, Huffman engaged in a conversation concerning the union. Testimony was received that Foreman Brennan was in the vicinity when this conversation took place. Less than an hour later, Huffman was summoned into Broadstone's office and was told he was laid off due to insufficient market demand. Three other employees were laid off that day.

Employee McIver, upon being laid off asked Broadstone why? He replied, in essence, that the group of employees as a whole was a threat to the Company. During the afternoon of that same day, May 3, 1979, Foreman Brennan stated to employee Barnes, in the presence of two other employees that the employees were being fired

because of union activities. Mr. Brennan denies having made this statement.

Following the layoffs and discharges, several part-time employees began to work full time. Voluntary overtime continued and two new employees were hired to replace two employees who had quit. Further, in mid-May the respondent contracted out additional assembly work as well as the work that was transferred from the Webster Street plant.

■ The record indicates, via the testimony of two employees, that Mr. Roettele told employees at the Taylorsville Road plant that if the Union came in he would close the plant and go elsewhere or reopen later. Testimony also indicates Mr. Roettele stated that whatever increased benefits were received by the Webster Street employees would also be received by the employees at the Taylorsville Road plant. Such statements clearly constituted coercive statements against union activities and are therefore violative of Section 8(a)(1).

■ Further, substantial evidence supports the Board's conclusion that statements were made by Foreman Brennan on May 3, 1979, to a discharged employee in the presence of two other employees, one of whom was not discharged, that employees were fired because of union activities. There is a dispute in the testimony inasmuch as Foreman Brennan denies having made the statements that the three employees attributed to him. And, it should be noted that this court has stated that in making credibility determinations the court is unwilling to enforce a back-pay award upon the uncorroborated testimony of one who would be the beneficiary of reinstatement and a back-pay award. *Delco Air Conditioning Div. v. NLRB*, 649 F.2d 390 (6th Cir. 1981). In the present case, however, the testimony of employee McCollum, who was not discharged by the respondent and who is not the beneficiary of reinstatement and back pay, corroborates the testimony of the two employees who were discharged. Further, inasmuch as the statements were made in the presence of a nondischarged employee, such statements did

constitute a threat against union activities violative of section 8(a)(1). *Capital Broadcasting Corp. v. NLRB*, 479 F.2d 329, 330 (6th Cir. 1973).

■ The central issue in this case is whether substantial evidence exists to support the Board's conclusion that the discharge of ten employees was motivated by the purpose of discouraging union activities at the Taylorsville Road plant. Reviewing the credibility findings and inferences drawn by the Board from the evidence, the test is whether the Board's conclusions are reasonable in light of the proven facts. *NLRB v. G&S Metal Products Co., Inc.*, 489 F.2d 441 (6th Cir. 1973).

This case presents the issue of evaluating the employer's intent in light of evidence supporting mixed-motives of the employer. Concerning mixed-motive cases, this court has recently stated:

> The proper test for evaluating mixed-motive cases is whether punishment of protected activity or anti-union animus was a dominant motive in the employer's actions. The burden has been placed on the general counsel to demonstrate that absent protected activities the suspension or discharge would not have taken place.

*Charge Card Ass'n v. NLRB*, 653 F.2d 272, 275 (6th Cir. 1981). In *Charge Card*, this circuit recognized a second test for mixed-motive cases applied by the Board. In *Wright Line*, 251 NLRB No. 150, 105 LRRM 1169 (1980), the Board applied a shifting burden test as follows: first, the board must demonstrate that the illegal purpose of discharging employees for their union activities was a *motivating purpose*; then the employer must demonstrate (burden of persuasion) that the same action (discharge) would have taken place in the absence of the illegal motivation. On appeal, however, the First Circuit reconstructed the test in *Wright Line*. The court held that in mixed-motive cases the correct substantive standard for evaluating the propriety of a reinstatement order is whether the discharge would have occurred *but for* the protected union activities. *NLRB v. Wright Line, A*

*Div. of Wright Line,* 662 F.2d 899 (1st Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). The court went on to state procedurally that in establishing a prima facie case the Board must demonstrate that the protected conduct was a motivating or substantial factor in the decision of the employer to discharge employees. Upon establishment of the prima facie case, the burden shifts to the employer to demonstrate that the discharge would have taken place even in the absence of the protected activity; such burden, however, is a burden of going forward to proffer a legitimate reason for its action. This approach was also recently adopted in the Third Circuit. *Behring Int'l, Inc. v. NLRB,* 675 F.2d 83 (3d Cir. 1982).

The shifting burden test used by the Board in *Wright Line, supra,* relies on the Supreme Court opinion of *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), which dealt with an employee deprived of First Amendment rights. This shifting burden test is in apparent conflict with the Supreme Court's decision concerning statutory rights under Title VII of the Civil Rights Act as outlined in *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The question exists, therefore, as to whether analysis of mixed-motive cases under the National Labor Relations Act should proceed under *Mt. Healthy* or *Burdine.* Under the facts of this case, however, this court finds it unnecessary to address this issue.

█ Under either the dominant motive test or the shifting burden test, we conclude that there is substantial evidence to support the Board's conclusion that the reason for the discharge of employees was to punish them for their union activities. The following factors support the Board's conclusion: the employees were discharged without notice contrary to past company practices at a time when union activities were in beginning stages; the Company had stated open hostility toward unions; the president of the company made threats about relocating the plant or closing it and reopening at a later time; statements were made by management personnel that indicated that the Company discharged employees because of union activities; shifting excuses were given as the basis for the discharges; two new employees were hired, part-time employees began to work full time, voluntary overtime increased, and there were discussions about starting a second shift.

Accordingly, we affirm the Board's order and grant the Board's application for enforcement.