**ITT AUTOMOTIVE, a Division of ITT Industries, Inc., Petitioner/Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner.**

Nos. 97–6339, 97–6436.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 28, 1999.

Decided Aug. 10, 1999.

Curtis L. Mack (argued and briefed), Richard B. Hankins (briefed), Mack, Haygood & McLean, Atlanta, GA, Robert D. Harris (briefed), ITT Industries, White Plains, NY, for Petitioner Cross–Respondent.

Frederick C. Havard (briefed), John D. Burgoyne, Robert J. Englehart, Jeffrey Horowitz (argued and briefed), Aileen A. Armstrong, National Labor Relations Board, Appellate Court Branch, Washington, D.C., for Respondent Cross–Petitioner.

Jordan Rossen (briefed), Nancy Schiffer (briefed), Associate General Counsel, International Union, UAW, Detroit, MI, for Amicus Curiae.

Before: KENNEDY, DAUGHTREY, and CLAY, Circuit Judges.

CLAY, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. KENNEDY, J. (pp. 392–394), delivered a separate opinion concurring in part and dissenting in part.

## OPINION

CLAY, Circuit Judge.

Petitioner ITT Automotive ("ITT") seeks review and Cross–Petitioner National Labor Relations Board ("NLRB") seeks enforcement of an order entered by the NLRB on September 30, 1997, finding that ITT engaged in unfair labor practices in violation of § 8(a)(1), (3) of the National Labor Relations Act, 29 U.S.C. § 158 (1998), in connection with a union representation election held at its facilities. For the reasons set forth below, we ENFORCE IN PART the order of the NLRB

and GRANT IN PART the petition for review of ITT.

## I.

ITT manufactures automotive parts in plants located throughout the United States, Canada and Mexico. On February 11, 1994, the International Union, United Automobile, Aerospace & Agricultural Implement Workers of America ("UAW" or "Union") filed with the NLRB a Petition for Certification of Representative to represent certain employees at the Oscoda, Tawas, and East Tawas, Michigan facilities of ITT, which together employ over nine hundred workers. The NLRB scheduled a representation election for March 30, 1995.[1]

### A. PRE–ELECTION CONDUCT

In the months preceding the election, ITT campaigned against union representation and engaged in activities which numerous employees viewed as a calculated effort to threaten the loss of jobs if the union prevailed in the election. For example, two months prior to the election, employees discovered that ITT had wrapped several pieces of equipment at the Oscoda facility with plastic sheeting, placed them in the employee parking lot, and labeled them with notices saying, "Mexico Transfer Job Per Schedule This Job will Trasnsfer [sic] when Bank is Complete."[2] (J.A. at 1055–58.) Employee Wayne Yoesting saw a stack of such notices sitting on a supervisor's desk located by the main aisle. When Yoesting asked supervisor William Wyrock about the notices, Wyrock told him "something like 'mind my own business' and 'read it and it should be self-explanatory.'" (J.A. at 25.) Ultimately, ITT removed the wrapped equipment and replaced it with newer equipment.[3]

At the Tawas City facility, employee Karen Richardson saw ITT supervisor Gary Simmons drive his pickup truck to the employee parking lot and park near the main entrance used by hourly employees. She saw Simmons load three portable work stations called "boards" onto the truck, and saw Simmons stand by and watch passing employees.[4] Although management had announced that jobs were increasing at the plant and that further job increases were expected, Richardson viewed Simmons' behavior as ITT "trying to show us how easy it is to remove boards, that they can just use a pickup truck." (J.A. at 1178.) Similarly, at the Oscoda facility, ITT resurfaced the floors in plant five in accordance with its regular practice of doing so every two years. Prior to 1992, the company resurfaced by moving all of the equipment from one part of the plant to another. Although it had never before done so during resurfacing, shortly before the 1995 election, ITT moved the equipment out of Oscoda's plant five and loaded it onto four large trailers parked in the employee parking lot during the resurfacing. One employee told another that these actions implied that the company had "proved ... that they could pack up and move overnight." (J.A. at 1108.)

1. This was the second scheduled election at the ITT plants. The first election in 1994 resulted in unfair labor practice charges against ITT. ITT settled that matter by agreeing to post a notice promising that ITT management would no longer engage in coercive tactics.

2. ITT's facility in Guaymas, Mexico performed work similar to the work performed in ITT's Oscoda plant. Occasionally, ITT transferred work from its Oscoda facility to its Mexico plant. A "bank" is a supply of inventory that must accumulate before the compa-

ny can relocate a manufacturing process to another plant.

3. The employees who testified about having seen the wrapped equipment did not know whether ITT actually sent the equipment to Mexico.

4. A "board" is a work station weighing between fifty and one hundred pounds that contains testing equipment and compartments for spare parts and material such as glue and tape.

Close to the time of election, ITT distributed a total of ninety-three leaflets to its employees that included newspaper clippings detailing earlier strikes called by UAW and by other unions at other company plants. The leaflets described a strike called by the UAW against ITT that began in March 1976 and lasted 4 ½ years. The leaflets also told employees that "the only guarantee" against strikes at ITT was to vote against the Union. (J.A. at 24.) One leaflet stated:

ITT Automotive is not going to give in to unreasonable demands. The only thing that [the Union] can do about it is to go on strike.... [T]he Company would bargain in good faith. But we would bargain very hard! You have no guarantee that you would end up with as good a wage package as you have now!

(J.A. at 24, 479.) At the Oscoda plant, employees saw signs posted in the windows of managerial offices and in the company's enclosed, locked bulletin board near the employee lunchroom that said, "Don't want it—UAW—don't need it—I NEED MY JOB!" (J.A. at 1110–12.)

ITT, through its managers, also made speeches urging employees to vote against the Union before the election. At the East Tawas facility, Robert Davies, Manager of the Fluid Handling Systems division, told employees that although ITT would bargain, it would bargain hard. At the Oscoda facility, Davies told employees that if a third party such as the Union entered the plant and the plant became unprofitable, ITT would shut down the plant. Davies did not explicitly state that the plants would close if the Union was elected its employees' representative. George Treglown, Manager of Human Resources at ITT, told Oscoda employees that if the Union won, breakdowns in negotiations might occur. Treglown did not expressly state that the plant would close just because the Union won the election, but told employees that if the Union won, they: would probably have to go to Detroit to negotiate a contract. That during this time that we [on the negotiating committee] would not be receiving any pay from the company or the union ... That we would get up there and the company would bargain hard that we would get frustrated because we were getting no pay and things would disintegrate.... That the company would negotiate real hard with us and that everything would just bog down and we would all get frustrated and it would just disintegrate.

(J.A. at 856–57, 977.)

Finally, Ralph Iorio, President of the Fluid Handling Systems division, gave speeches at the Oscoda, East Tawas, and Tawas City facilities on March 28, 1995, just two days before the election. Iorio discussed ITT's need to stay globally competitive, and told employees that ITT would perform assembly functions at those plants where it was most efficient to do so. He said that in his experience, "wherever there has been a union, sooner or later there were problems." (J.A. at 252.) He stated that he did not know what UAW would do when ITT said " 'no' to demands which we consider unreasonable." (J.A. at 252.) Finally, Iorio stated:

In other cases we have moved the work and closed the plant especially where light assembly or manual work was being done and the work was easily transferred. You know what has happened at some ITT plants where there were strikes. Don't let it happen here. I can't think of one example where a union has made a plant more productive, more efficient, or more secure.... [W]henever there are unions, there can be strikes.... Don't let the UAW create problems for all of us.

(J.A. at 253.)

Employee Theresa Whalen testified that on March 29, 1995, the day before the election, her shift supervisor offered her a "vote no" button. Although Whalen stated at first that she wore the button, she later said that she placed the button on the ledge where she worked. Employee Beni-

ta Pardonnet testified that she saw ITT supervisors asking two or three employees if they wanted "vote no" buttons. On election day, March 30, 1995, Pardonnet saw ITT managers or supervisors standing "in a circle" in an aisle where employees had to pass to get to the polls and from where the supervisors could see employees waiting to vote. (J.A. at 45–46.) Pardonnet also stated that the circle stood approximately fifteen feet from the supervisor's desk, which was located approximately sixty feet from the aisle employees had to use to vote.

The tabulation of election results revealed that 503 employees voted against representation, while 321 voted for representation by the Union. On the morning after the election, Pardonnet, an active and vocal supporter of the Union throughout the campaign, approached ITT General Supervisor Richard Karbowski to offer congratulations. According to Pardonnet, Karbowski shook his finger at her and said, "Lady, this is Round 11; the company goes 15," and "Where are your goddamn UAW protection now [sic]?"[5] (J.A. at 48, 858.)

## B. POST–ELECTION, PRE–HEARING CONDUCT

On April 19, 1995, the Union timely filed eight objections to conduct on the part of Petitioner, claiming Petitioner thereby unlawfully affected the results of the election.[6] On the same date, the Union also filed various charges of unfair labor practices with the NLRB in connection with ITT's conduct before and during the election.[7] On May 10, 1995, attorneys representing ITT met with Pardonnet for three hours in connection with the Union's charges of unfair labor practices. Counsel for ITT told Pardonnet that she was free to leave at any time and that she was free to not answer their questions. They told her that she would not suffer reprisal or negative conduct on the job if she terminated the interview or refused to answer their questions. The attorneys asked Pardonnet (1) whether employees had discussed incidents where supervisors asked employees to wear "vote no" buttons; (2) whether employees wearing "vote no" buttons actually supported the union or employees wearing "vote yes" buttons actually supported ITT; (3) why employees supported the union; (4) whether any employees took notes regarding the events at the ITT plants in question and whether employees were discussing those notes amongst themselves. At the end of the interview, ITT's attorneys put Pardonnet's statements into an affidavit, and asked her to review it. When Pardonnet noticed that one of her comments was not in the affidavit, counsel for ITT put the comments into the affidavit in accordance with her request. Pardonnet signed this affidavit.

## C. SUSPENSION OF PRO–UNION EMPLOYEE

Just over one month after her meeting with counsel for ITT, on June 20, 1995, Pardonnet was processing airplane parts with employee Dorothy Gapuz. With a quota of fifty parts per person per hour, Pardonnet and Gapuz were required to produce 400 parts each by the end of their eight-hour shift. Under ITT policy, they

---

5. Karbowski maintains that he told Pardonnet that "[t]his is a fifteen round bout. We knocked you out in the tenth round, we still got five more rounds to go yet." (J.A. at 1244.) He asserts that he attempted to use a sports metaphor to illustrate that although there had been a long battle, there was still a long way to go.

6. The Union later withdrew two of these Objections.

7. The Union alleged that ITT unlawfully removed pro-union literature from an employee lunchroom, recorded the names of employees who did not accept election paraphernalia from the company, interrogated an employee who was not wearing a "vote no" button, and threatened employees with the loss of jobs, plant closings, inevitability of strikes, and futility of bargaining.

could leave early if they reached their quota in less than eight hours. Pardonnet stated that she had met the production requirement on her time card, had her supervisor, Denise Wilson, sign the card, and left the plant early. Wilson knew that Pardonnet was a "big union supporter." (J.A. at 1414.) Later that evening, Pardonnet received a call from Patricia Staubaum, an inspector for ITT, who informed her that in response to a complaint by Gapuz, she checked Pardonnet's production and found that the amount of production stated on her time card was false. Staubaum's call "floored" Pardonnet, who "had no idea" her parts had come up short. (J.A. at 49.) The next day, June 21, 1995, Pardonnet told Wilson of her conversation with Staubaum. Wilson reported the matter to Plant Manager Robert Sharp rather than to Karbowski because Karbowski was not at the plant on the day in question.

Sharp called Pardonnet into his office later that afternoon and told her that ITT was suspending her indefinitely pending an investigation into the falsification of her time card. Pardonnet did not return to work until June 27, 1995, when she met with Sharp, Karbowski, and Wilson. Pardonnet could not give any explanation for the erroneous count. Sharp said that although he believed her miscount was intentional, he would allow her to return to work. Under standard ITT policy, ITT may terminate an employee for an offense such as theft or falsification of records. However, because ITT did not find that her conduct was intentional, Sharp gave Pardonnet the "benefit of the doubt" and allowed her to return to work. (J.A. at 880–81.) Pardonnet signed her suspension notice "under protest." (J.A. at 50.) ITT had previously suspended Pardonnet on April 5, 1990 for having too many no-fault absences, on March 13, 1992 for leaving without punching out, and on January 24, 1994 for producing too many bad parts.

## D. PROCEDURAL HISTORY

On October 10, 1995, the General Counsel issued a Complaint and an Amended Complaint on the consolidated Objections and unfair labor practice charges. An administrative law judge ("ALJ") conducted a hearing in Tawas City, Michigan from February 21, 1996 to February 23, 1996 concerning the allegations. On July 17, 1996, the ALJ issued a decision concluding that ITT had engaged in coercive and intimidating behavior, unlawfully interrogated an employee, and created an impression of bargaining futility during the pre-election period that had interfered with the right of the employees to make a free choice about representation. The ALJ further recommended that the NLRB set aside the results of the March 30, 1995 election and that a new election be held.

ITT filed exceptions to the ALJ's decision with the NLRB. The General Counsel also filed an exception to the failure of the ALJ to find that ITT violated § 8(a)(1) by unlawfully interrogating Pardonnet in preparation for the unfair labor practices hearing in this case. On September 30, 1997, the NLRB issued a Decision and Order affirming the ALJ's findings and conclusions, and granting the General Counsel's exception that an additional unfair labor practice had occurred. Specifically, the NLRB found (1) ITT violated § 8(a)(1) of the NLRA by predicting the loss of jobs as a result of union representation, coercively interrogating employees about their willingness to wear anti-union buttons, giving the impression that bargaining would be futile, and threatening an employee in retaliation for her support of the union; (2) ITT violated § 8(a)(1) by exceeding the legitimate scope of inquiry while interviewing Pardonnet in preparation for an unfair labor practice hearing; and (3) ITT violated §§ 8(a)(1), (3) by suspending Pardonnet in retaliation for her known union activities. As a practical matter, the NLRB's order requires ITT to cease and desist from the unfair labor practices identified by the NLRB and from coercing or interfering with employees in the exercise of their rights under the

NLRA. Additionally, the NLRB's order requires ITT to make Pardonnet whole for losses she sustained due to the suspension, and requires ITT to post a remedial notice. ITT petitioned this Court for review of the NLRB's order on November 5, 1997. The NLRB filed a cross-application for enforcement of its order on December 1, 1997.

## II.

■■■ This Court reviews the NLRB's factual determinations, and its application of the law to a particular set of facts, for substantial evidence. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477–78, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Turnbull Cone Baking Co. v. NLRB*, 778 F.2d 292, 295 (6th Cir.1985). Substantial evidence is more than a mere scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). Our review of the record must consider evidence that runs contrary to the NLRB's findings. *See DTR Indus. v. NLRB*, 39 F.3d 106, 110 (6th Cir.1994). However, as long as the record as a whole contains substantial evidence supporting the NLRB's findings, this Court must sustain those findings even if we might have reached a different conclusion upon de novo review. *See Universal Camera*, 340 U.S. at 493, 71 S.Ct. 456. Finally, this Court generally defers to the credibility determinations of the NLRB, particularly where the "record is fraught with conflicting testimony and essential credibility determinations have been made." *Tony Scott Trucking, Inc. v. NLRB*, 821 F.2d 312, 315 (6th Cir.1987).

## III.

ITT challenges on appeal three conclusions of the NLRB. First, ITT argues that substantial evidence does not support the finding that ITT interfered with, restrained, or coerced employees in the exercise of their right to vote in a representa-tion election, on the grounds that ITT had a right to express its anti-union views. Second, ITT argues that substantial evidence does not support the finding that ITT discriminated against an employee because of her affiliation with and advocacy on behalf of the union. Third, ITT argues that substantial evidence does not support the finding that its attorneys unlawfully interrogated an employee during its preparation for the NLRB hearing in this case. For the reasons set forth below, we conclude that while substantial evidence supports the finding that ITT unlawfully interfered with the right of employees to vote in a representation election and unlawfully discriminated against an employee for her support of the union, substantial evidence does not support the finding that counsel for ITT unlawfully coerced an employee when preparing for a hearing before the NLRB.

### A.

■■■ Section 8(a)(1) of the NLRA prohibits employers from interfering with, restraining, or coercing employees in the exercise of rights guaranteed them by § 7 of the NLRA. See 29 U.S.C. § 158(a)(1) (1998). Section 7 of the NLRA guarantees employees "the right to self-organization, to form, join, or assist labor organizations . . . and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157 (1998). Courts may find a violation of § 8(a)(1) even where the evidence does not show that employees were actually intimidated or coerced by an employer's conduct. *See NLRB v. Dickinson Press Inc.*, 153 F.3d 282, 286 (6th Cir. 1998). Rather, the evidence must demonstrate that, taken from the point of view of the employees, the reasonable tendency of the employer's conduct or statements is "coercive in effect." *Peabody Coal v. NLRB*, 725 F.2d 357, 363 (6th Cir.1984).

■■■ Among other things, the ALJ concluded that ITT created a coercive atmo-

sphere through the speeches of its managers and supervisors, all of whom spoke on the negative effects of unionization, and through written statements by ITT in leaflets describing strikes. In response, ITT argues that an employer has a firmly established right to free speech even as employees exercise their right to self-organize or to form or join unions. *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). Congress recognized this right in § 8(c) of the NLRA, which provides that:

> The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.

29 U.S.C. § 158(c) (1998). In balancing the employer's above delineated right to free expression against the employee's right to free association, the Supreme Court has observed that:

> [A]n employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union.... He may even make a prediction as to the precise effects he believes unionization will have on his company. In such a case however, the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control.... If there is any implication that an employer may or may not take action solely on his own initiative for reasons unrelated to economic necessities and known only to him, the statement is no longer a prediction based on available facts but a threat of retaliation based on misrepresentation and coercion.

*Gissel Packing*, 395 U.S. at 618, 89 S.Ct. 1918. Under *Gissel Packing*, an employer may claim the protections of § 8(c) as a

defense to an unfair labor practice charge of unlawful coercion in violation of § 8(a)(1). *See, e.g., NLRB v. Pentre Elec.*, 998 F.2d 363, 368–69 (6th Cir.1993). Indeed, " 'it is often difficult in practice to distinguish between lawful advocacy and threats of retaliation' " when an employer seeks to point out to workers the adverse consequences of unionization during a representation election. *Id.* at 369 (quoting *NLRB v. Village IX, Inc.*, 723 F.2d 1360, 1367 (7th Cir.1983)).

■ Although ITT argues forcefully that statements made by its supervisors deserved the protection of § 8(c), we conclude that substantial evidence supported the conclusion of both the ALJ and the NLRB that ITT's statements did not merit § 8(c) protection because they reasonably tended to coerce employees. Although the leaflets presented objective facts about strikes that had taken place at other companies and at ITT itself, the leaflets also warned that although ITT would bargain in good faith, ITT would bargain "very hard" and as a consequence that employees may not "end up with as good a wage and benefit package as [they] have now!" (J.A. at 479.) Moreover, while the speeches of ITT supervisors reflected economic predictions that after unionization the plants might close if they became unprofitable or that strikes might occur as a result of ITT's refusal to give in to union demands, the ALJ properly found that these predictions were not supported by objective facts. Additionally, ITT's statements did not refer to matters over which ITT exercised no control. *Cf. Pentre Elec.*, 998 F.2d at 369 (observing that "employees may not reasonably conclude that they are being coerced where the opinions refer to matters over which the speaker has no control").

■ Indeed, ITT has not demonstrated any objective facts that suggest that UAW would make unreasonable demands, that unionization would cause the plants to become unprofitable, or that ITT would be unable to control the consequences of

unionization. *See Gissel Packing*, 395 U.S. at 618–19, 89 S.Ct. 1918 (stating that "conveyance of the employer's belief, even though sincere, that unionization will or may result in the closing of the plant is not a statement of fact unless . . . the eventuality of closing is capable of proof").[8] Although ITT relies heavily on this Court's decision in *Pentre Electric*, that case involved statements by a company's supervisors that the company would likely lose customers who did not employ union contractors if the company unionized. *See Pentre Elec.*, 998 F.2d at 369–70. As we noted, the supervisors in that case did not suggest that Pentre might close its doors, and therefore "[n]o employee could reasonably have come away from either speech with the belief that anti-union sentiment on the part of the company could lead to closure if the employees voted in favor of the union." *See id.* at 370. The instant case is dramatically different, as ITT supervisors expressly suggested, without objective facts for actually believing, that plants might close if employees voted in the union. Courts have repeatedly held that "in view of an employee's natural interest in continued employment, threats of plant closure are 'among the most flagrant of unfair labor practices.'" *Indiana Cal–Pro, Inc. v. NLRB*, 863 F.2d 1292, 1301 (6th Cir.1988) (quoting *Gissel Packing*, 395 U.S. at 611 n. 31, 89 S.Ct. 1918).

 Moreover, while neither the spoken nor written statements of ITT expressly threatened employee jobs upon unionization, substantial evidence exists to support the finding that, taken together with ITT's conduct during the pre-election period, ITT interfered with the right of employees to vote freely in the representation election. The ALJ concluded that

ITT drove home the suggestion that jobs were at stake by acting so as to cause employees to believe ITT might transfer their jobs to ITT's Mexico plant. The ALJ credited the testimony of employees who saw signs indicating the transfer of equipment to Mexico, and of employees in Oscoda and in Tawas City who saw ITT move equipment onto trailers and trucks located in employee parking lots where the employees could easily see them. Additionally, the ALJ credited the testimony of an employee who saw "I NEED MY JOB!" signs posted in the windows of management offices and in ITT's locked employee bulletin board. Although ITT points to the conflicting testimony of its supervisors who said they did not see signs saying "I NEED MY JOB!" or suggesting the transfer of equipment to Mexico, this Court may not "normally substitute [its] judgment for that of the [NLRB] or administrative law judge who has observed the demeanor of the witnesses." *Universal Camera*, 340 U.S. at 493, 71 S.Ct. 456. Not only did the ALJ expressly credit the testimony of those employees who saw the signs, the ALJ expressly discredited the denials of ITT managers such as General Supervisor Karbowski and Floor Supervisor Sandra Lawlor who claimed they did not see the signs in question.

Additional evidence, even beyond that of ITT's "loss of jobs" campaign, supports the NLRB's finding that ITT coerced or restrained its employees' right to vote for representation by the union. Indeed, the ALJ credited the testimony of employees who saw ITT supervisors offering anti-union buttons to employees. As the NLRB has held, such behavior pressures employees to make a choice in public about whether to acknowledge their union sentiments and "effectively put[s] employees in

---

**8.** It is important to note that in *Pentre Electric*, this Court held that an employer is not required to "produce evidence to corroborate predictions about the effect of unionization to invoke the protection of section 8(c)." *Pentre Elec.*, 998 F.2d at 368. Read together with *Gissel Packing*, the *Pentre Electric* decision still requires an employer's statements to have

the support of precise objective facts—but simply does not require the employer to prove the truth of those statements. Indeed, as we have further elaborated, once an employer articulates an objective basis for his prediction, the NLRB must demonstrate that the prediction was not objective or was untruthful in nature. *See DTR Indus.*, 39 F.3d at 114.

the position of either having to accept or reject the [employer's] proffer." *A.O. Smith Automotive Prods.*, 315 NLRB 994, 1009, 1994 WL 720016 (1994). ITT's claim that there is no evidence on the record that employees to whom ITT offered buttons did not want those buttons is inapposite, as what makes the offer of such paraphernalia coercive is the pressure it places on an employee to declare his sympathies in public.

The ALJ also concluded, on the basis of employee testimony deemed credible by the ALJ, that ITT supervisors had engaged in coercive behavior by positioning themselves in the center of the building and near the intersection of aisles through which employees had to pass in order to vote. The NLRB has held that such conduct interferes with an employee's freedom of choice in an election. *See Performance Measurements Co.*, 148 NLRB 1657, 1659, 1964 WL 16318 (1964). Although ITT argues, on the basis of testimony given by Karbowski, that the supervisors did not obstruct employee passage to the voting area, we hesitate to interfere with the ALJ's credibility determinations, particularly since the ALJ expressly discredited Karbowski's testimony. Finally, the ALJ expressly credited the testimony of employee Benita Pardonnet that Karbowski overtly threatened her, and rejected, once again, the version of events set forth by Karbowski. Giving due deference to the credibility determinations of the ALJ, we believe substantial evidence supports a finding of coercion in this case.

 ITT has argued, in essence, that the conduct we have described above did not stem from bad faith, and that benign explanations for the conduct of its supervisors might exist. However, we must view the NLRB's decision in light of the fact that the balancing of the rights of the employer and employee "must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended

implications of the latter that might be more readily dismissed by a more disinterested ear." *Gissel Packing*, 395 U.S. at 617, 89 S.Ct. 1918. Taking together all of the evidence of conduct on the part of ITT prior to and during the election, we find that substantial evidence supports the decision of the NLRB in this case that ITT's actions reasonably tended to coerce its employees, and that therefore ITT violated § 8(a)(1) of the NLRA.

## B. SUSPENSION OF PRO–UNION EMPLOYEE

 Under § 8(a)(3) of the NLRA, an employer commits an unfair labor practice "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3) (1998). In the present case, the ALJ and the NLRB found that ITT violated both § 8(a)(3) and § 8(a)(1) by suspending Benita Pardonnet for five days because of her support for the union. Specifically, the ALJ found that ITT knew Pardonnet to be an active union supporter, and that by suspending Pardonnet, ITT responded to the allegation that Pardonnet had misrepresented her production amounts in a manner that departed from its usual practices. We believe substantial evidence supports that conclusion, despite ITT's claim that it was entitled to suspend Pardonnet for misconduct.

 As this Court has observed, § 8(a)(3) violations consist of two elements: anti-union animus, and the occurrence of a covered employment action. *See NLRB v. Fluor Daniel, Inc.*, 161 F.3d 953, 966 (6th Cir.1998). The NLRB bears the burden of showing that an adverse employment action resulted in whole or in part from anti-union animus, or "that the employee's protected conduct was a motivating factor in the adverse action." *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 401, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983).

Once the NLRB makes such a showing, however, the burden shifts to the employer to demonstrate, as an affirmative defense, that it would have taken the adverse action even in the absence of such animus. *See id.* Significantly, the NLRB need not produce direct evidence of improper employer motivation; rather, such wrongful animus "may be inferred from all the circumstances." *Birch Run Welding & Fabricating, Inc. v. NLRB*, 761 F.2d 1175, 1179 (6th Cir.1985). For example, an employer's deviation from past practices may indicate anti-union animus. *See NLRB v. ComGeneral Corp.*, 684 F.2d 367, 370 (6th Cir.1982). We must uphold the NLRB's determination of improper motivation "if it is reasonable in light of the proven facts." *See id.*

Considering all of the circumstances, we observe as a preliminary matter, in accordance with our conclusion that ITT conducted a campaign against election of union representation, that anti-union animus existed generally at the time ITT suspended Pardonnet, and that ITT was aware of Pardonnet's activities in support of the union. Moreover, the evidence discloses that ITT deviated from its usual practices in its response to the charge that Pardonnet had falsified her production report. While Plant Manager Sharp promised Pardonnet that ITT would investigate the accusation that she intentionally lied about her production amount, Wilson, Pardonnet's supervisor, admitted that she never investigated the matter and that Pardonnet never got to tell her side of the story. Moreover, Pardonnet never admitted to lying about the production amount and went so far as to sign her suspension notice "in protest." As a net result, ITT never discovered whether Pardonnet in fact falsified her production amount. Nevertheless, ITT suspended her, even though the only other employee suspended for a first offense of falsifying production amounts confessed her misrepresentation to Karbowski.

Additionally, Pardonnet's suspension notice revealed that Pardonnet did not have a violation on her record for the previous twelve months and marked her alleged violation in this case as a first violation that would merit a "first written warning." To the contrary, her employee progress review stated that she was "a good, hard worker who is very willing to do new jobs & help work the 'bugs' out of them" and told her to "[k]eep up the good work." (J.A. at 49.) Finally, when Wilson first made a written report of the incident, she did not believe that Pardonnet had intentionally falsified her production amount and considered not even writing her up. These undisputed circumstances support a showing that ITT's action against Pardonnet deviated from prior practices and that it was motivated at least in part by an improper animus.

Although ITT claims that it would have suspended Pardonnet in any event and that other employees at ITT received similar suspensions for such conduct, we agree with the NLRB that ITT has failed to carry its burden of showing that it would have suspended Pardonnet were it not for her union sympathies. ITT failed to show that it treated other similarly accused employees the same way by, for example, suspending them without conducting any investigation. ITT's allegation that it had written Pardonnet up for various violations in the past falls short of proving that ITT would have suspended Pardonnet in any event. For example, while the record contains evidence of a progressive disciplinary system that takes into account only disciplinary actions occurring within the last twelve months of a new violation, ITT failed to show that Pardonnet's previous infractions occurred within twelve months of the one alleged in this case. ITT has failed to show that it would have suspended her on that basis, instead of following the progressive disciplinary program. Moreover, we note that as with Karbowski, the ALJ discredited the testimony of Wilson, who impressed the ALJ "as being a witness who was willing to give any testi-

mony that might help the Company's cause." (J.A. at 51.) Under these circumstances and because ITT failed to show that it would have suspended Pardonnet in any event, we conclude substantial evidence supported the NLRB's finding that ITT committed an unfair labor practice by discriminating against Pardonnet.

## C.

 As this Court has long recognized, an employer has the right to interview employees in order to discover facts relevant to the issues raised in an unfair labor practices complaint. *See NLRB v. Winn–Dixie Stores, Inc.*, 341 F.2d 750, 753 (6th Cir.1965). In accordance with its decision in *Johnnie's Poultry Co.*, 146 NLRB 770, 775, 55 L.R.R.M. 1403, 1406(BNA), 1964 WL 15910 (1964), *enforcement denied on other grounds*, 344 F.2d 617, 619 (8th Cir.1965), the NLRB has consistently required an employer to give a particular set of "warnings" before interviewing an employee. *See, e.g., Dayton Typographic Serv. v. NLRB*, 778 F.2d 1188, 1195 (6th Cir.1985); *L & L Wine & Liquor Corp.*, 323 NLRB 151, 1997 WL 303677, at *11 (May 30, 1997). Specifically, an employer must[9](1) communicate to the employee the purpose of the questioning; (2) assure the employee that no reprisal will take place;

and (3) obtain the employee's voluntary participation. *See Bill Scott Oldsmobile*, 282 NLRB 1073, 124 L.R.R.M. (BNA) 1161, 1987 WL 90245 (1987). Here there is no dispute that counsel for ITT gave Benita Pardonnet the necessary *Johnnie's Poultry* warnings before questioning her as they prepared for the NLRB hearing.

 Nevertheless, even after an employer gives *Johnnie's Poultry* warnings, an interview may violate § 8(a)(1) if "under all the circumstances the interrogation reasonably tends to restrain, coerce, or interfere with rights guaranteed by" the NLRA. *See Dayton Typographic Serv. v. NLRB*, 778 F.2d 1188, 1194 (6th Cir.1985). While interrogation of an employee is not per se unlawful, *see NLRB v. Thill, Inc.*, 980 F.2d 1137, 1140 (7th Cir.1992), "[a]n interrogation becomes illegal when the 'words themselves or the context in which they are used ... suggest an element of coercion or interference.'" *Cooper Tire & Rubber Co. v. NLRB*, 957 F.2d 1245, 1255 (5th Cir.1992) (quoting *NLRB v. Ambox, Inc.*, 357 F.2d 138 (5th Cir.1966)); *see also NLRB v. Complas Indus., Inc.*, 714 F.2d 729, 735 (7th Cir.1983). In assessing the coercive nature of an interrogation, the NLRB must consider "the background, the nature of the information sought, the questioner's identity, and the place and method

9. The dissent suggests that our use of the word "must" here "rewrites the law of this Circuit," on the grounds that this Circuit has "not adopted the NLRB's position that the *Johnnie's Poultry* warnings 'must' be given to ensure the legality of the interrogation." However, while employing a case-by-case approach to the issue of employer interrogations, this Circuit has never gone so far as to reject the holding of *Johnnie's Poultry*, in which the NLRB stated that "the employer *must* communicate to the employee the purpose of the questioning, assure him that no reprisal will take place, and obtain his participation on a voluntary basis...." 146 NLRB at 775, *quoted in L & L Wine & Liquor*, 1997 WL 303677, at *11 (emphasis added).

The dissent takes great liberty in its interpretation of *Dayton Typographic*, in which this Court merely stated that "the NLRB considers" the factors outlined by the *Johnnie's Poultry* warnings when evaluating the

coerciveness of the questioning of employees. 778 F.2d at 1195. In so remarking, *Dayton Typographic* cited both the *Johnnie's Poultry* decision and this Court's decision in *Montgomery Ward & Co. v. NLRB*, 377 F.2d 452, 456 (6th Cir.1967), a case adopting the "must" language of *Johnnie's Poultry*, without expressing any disagreement. 778 F.2d at 1195. Moreover, this Court's decision in *Anserphone* made absolutely no mention of *Johnnie's Poultry* warnings, and therefore made not a single statement disagreeing with the NLRB on whether they must be given. Rather, our decisions in *Anserphone* and *Dayton Typographic* reflect only that while an employer must give *Johnnie's Poultry* warnings, error in the failure to give such warnings will not result in per se liability. *See Bill Scott Oldsmobile*, 282 NLRB 1073, 1076–77, 1987 WL 90245 (1987) (Dotson, dissenting in part).

of interrogation."[10] *Dayton Typographic*, 778 F.2d at 1194. Generally, the questioning must occur in a context that is free from employer hostility, and the questioning must not itself be coercive. *See Montgomery Ward & Co. v. NLRB*, 377 F.2d 452, 456 (6th Cir.1967).

■■■■■ Moreover, in determining the legality of a particular interrogation, we must bear in mind that the privilege of interviewing employees to discover relevant facts is a narrow one, and is "limited to the purpose of preparing the case for trial." *Surprenant Mfg. Co. v. NLRB*, 341 F.2d 756, 762–63 (6th Cir.1965). As we have observed, the privilege:

> does not include the right to pry into matters of union membership, to discuss the nature or extent of union activity or to dissuade employees from joining or remaining members of a union. The cases recognize that the rule calls for a delicate balance between the legitimate interest of the employer in preparing its case for trial, and the interest of the employee in being free from unwarranted interrogation.

*Id.* at 763. Thus, an employer may not question an employee regarding matters which fall outside the scope of a complaint but must limit its interrogation to "questions relevant to the charges of unfair labor practice and of sufficient probative value to justify the risk of intimidation which interrogation as to union matters necessarily entails...." *Winn–Dixie*, 341 F.2d at 752–53 (quoting *Joy Silk Mills v. NLRB*, 185 F.2d 732, 743 (D.C.Cir.1950)).

■■■■ In this case, the NLRB, in response to the General Counsel's exception to the ALJ's Decision, found that ITT violated § 8(a)(1) when its attorneys coercively interrogated Benita Pardonnet in preparation for the unfair labor practices hearing in the instant case. While observing that ITT's counsel gave Pardonnet the requisite *Johnnie's Poultry* warnings, the NLRB found fault with the inquiries as to whether employees truly agreed with the sentiments expressed by the pro-union or anti-union buttons they wore, whether employees had discussed certain election-related issues at union meetings, and why employees were unhappy and felt they needed a union. The NLRB held that these were "impermissible inquiries aimed at eliciting information concerning employees' union sentiments" and were "unrelated to the charges and objections at issue." (J.A. at 60.)

In applying the principles we have identified regarding the legality of employer interrogations, we find it is not so clear that the above referenced questions were irrelevant and impermissibly sought to elicit information concerning employee sentiments about the union. While at first blush it appears that the questions about whether employees discussed the election at union meetings and about pro-union sentiment exceeded the bounds of the complaint, counsel for ITT likely sought to gather information that it could use to impeach the testimony of employee witnesses at the unfair labor practices hearing. We observe that although the NLRB concluded that ITT sought to gather information about the pro-union sentiments of ITT employees, Pardonnet testified that counsel for ITT did not ask which employees in particular wore "vote no" buttons while actually supporting the union, and

---

**10.** In analyzing the legality of employer interrogations, some courts have considered eight factors characterized as the *Bourne* criteria. *See, e.g., Cooper Tire & Rubber*, 957 F.2d at 1255–56 (citing *Bourne v. NLRB*, 332 F.2d 47, 48 (2d Cir.1964)). The *Bourne* factors include (1) the history of the company's attitude toward its employees; (2) the type of information sought; (3) the rank of the interrogator within the company hierarchy; (4) the place and manner of interrogation; (5) the truthfulness of the employee's response; (6) the validity of the company's purpose in obtaining information about the union; (7) whether the company communicated its purpose to the employee questioned; and (8) whether the company assured the employee no reprisals would result. *See Cooper Tire & Rubber*, 957 F.2d at 1255–56.

vice versa, and did not otherwise ask about the pro-union sentiments of particular employees. The generality of counsel's questions in this regard suggests he may have hoped to explore the basis for a possible bias against ITT among employees, or to discover whether employees had made plans to corroborate one another's stories. As for the question about election buttons, we observe that the complaint charged ITT with an unfair labor practice in connection with its alleged distribution of buttons, and that counsel for ITT may have hoped to discover information it could use to argue that distribution of buttons was not coercive.

██ Moreover, while we must consider the relevance and probative value of an employer's inquiry, to hold an employer liable under § 8(a)(1) we must ultimately determine whether under all the circumstances, including the identity of the questioner and the place and method of interrogation, the interview reasonably tended to restrain, coerce, or interfere with the employee's rights. See *Dayton Typographic*, 778 F.2d at 1194. In the past, we have denied enforcement of NLRB orders holding unlawful an employer's questioning of an employee where that employee in fact wanted to cooperate. See *id*. at 1195; *Anserphone, Inc. v. NLRB*, 632 F.2d 4, 6 (6th Cir.1980). In *Anserphone*, we refused enforcement in the absence of evidence on the record "to indicate that the employee who furnished the company representative with a copy of the affidavit she submitted to the board did so out of any fear, rather it appears she did it in the spirit of cooperation." 632 F.2d at 6. Similarly, in *Dayton Typographic*, we followed *Anserphone* and denied enforcement even where counsel for the employer failed to give *Johnnie's Poultry* warnings, on the grounds that the employee who furnished an affidavit to the employer "wanted to cooperate." *Dayton Typographic*, 778 F.2d at 1195.

We believe that while counsel for ITT may have posited some general questions that fell outside the bounds of the complaint, substantial evidence did not support the NLRB's determination that the interview of Pardonnet conducted by ITT's counsel reasonably tended to coerce her ability to exercise her rights. A review of the record reveals that counsel for ITT interviewed Pardonnet, and informed her that she was free to leave, that she was free not to talk, and that she was free not to answer the questions. The record indicates that Pardonnet did not in fact feel coerced in any way during the meeting, which took place in a conference room at the plant. Indeed, Pardonnet gave answers, without hesitation, even to the questions the NLRB found objectionable. Counsel permitted Pardonnet to take a short break during the interview, which lasted approximately three hours. At the end of the interview, counsel for ITT summarized her statements in a written affidavit, and asked her to sign. When Pardonnet wanted to include more information in the affidavit, counsel added her supplemental statements to the affidavit. Pardonnet willingly signed and gave the affidavit to ITT's attorneys. Under these facts and circumstances, we conclude substantial evidence does not support the NLRB's finding that the interview reasonably tended to coerce Pardonnet in the exercise of rights guaranteed her by § 7 of the NLRA.

## IV.

We conclude that although substantial evidence supports the findings that ITT unlawfully interfered with the right of employees to vote in a representation election and that ITT unlawfully discriminated against an employee for her support of the union, substantial evidence does not support the finding that counsel for ITT unlawfully interrogated an employee while preparing for a hearing before the NLRB. Accordingly, we GRANT, in part, ITT's petition for review, and ENFORCE, in part, the order of the NLRB.

KENNEDY, Circuit Judge, concurring in part and dissenting in part.

I agree that substantial evidence supports the Administrative Law Judge's ("ALJ") finding, adopted by the Board that Pardonnet was suspended because of her union activities. I also agree that substantial evidence did not support the Board's determination that the interview of Pardonnet conducted by ITT's counsel tended to coerce her ability to exercise her rights. I join in the Court's opinion on that issue except for the statement that the employer "must" give an employee the *Johnnie's Poultry* warnings. That holding is inconsistent with *Dayton Typographic Service, Inc. v. NLRB*, 778 F.2d 1188 (6th Cir.1985). The *Dayton Typographic* court stated that the warnings are factors to be considered and held that the interview was permissible without warnings because the employee "wanted to cooperate" and, under all of the circumstances, the interview did not tend to restrain, coerce, or interfere, with the employee's rights. *Id.* at 1195. The *Dayton Typographic* court noted that the Sixth Circuit had not adopted the NLRB's position that the *Johnnie's Poultry* warnings "must" be given to ensure the legality of the interrogation. See *id.* at 1194 (noting that the Court's decision in *Anserphone, Inc. v. NLRB*, 632 F.2d 4 (6th Cir.1980), conflicted with the NLRB's stance on this issue). By adopting the NLRB requirement that an employer "must" give an employee the *Johnnie's Poultry* warnings, the Majority rewrites the law of this Circuit. I do not believe that the Court should add to this Circuit's standard.

While I agree with the Majority that substantial evidence supports some of the findings that ITT coerced its employees, there are some which I do not believe are supported by substantial evidence. The ALJ found that the removal during the election period of equipment out of building 5 for the two days it took to resurface the floor was done to coerce the employees by showing them how easy it would be to remove the machinery to another plant.[1] On previous occasions, while resurfacing the floor of plant 5, the company had not moved the equipment *outside* the building. The ALJ disregarded the testimony that the equipment had been moved outside the building this time because there was more equipment to be moved than in previous years. The testimony is unrefuted that all the equipment could not be moved to one side of the plant. The ALJ concluded that the action was coercive because moving the equipment outside indicated how easy it was to move the machinery. Moving it from one side of the plant to the other is equally a demonstration of how easy it is to move the equipment. The resurfacing was done during a time when, because of the holidays, very few employees were working.

The ALJ noted additional conduct that supported his decision that the company's actions were coercive. This conduct included the display of wrapped equipment labeled "MEXICO TRANSFER JOBS" and the video taping of an operation for use by employees at the company's plants in Mexico. A finding that this conduct was coercive is not supported by substantial evidence. At various times prior to the instant organization drive, ITT had transferred certain work to Mexico. It also had added new equipment and jobs in Michigan. During the election campaign, it hired additional employees and retained the old employees.

Its Mexico plant performed some of the same operations as the Michigan plant. The video taping was to train Mexican workers presumably to improve their performance. The Board's conclusion that it was made to frighten employees into believing that jobs would be lost to Mexico

---

1. While a single employee drew this conclusion, she thought all the presses were removed. The four large presses had not been moved just as they had not been moved in prior years.

ignores the historical facts and the continuing increase in Michigan jobs.

Finally, I believe that the ALJ's finding that Mr. Iorio's speech to employees on March 28 (two days before the election) threatening employees with strikes, plant closings and bargaining futility, coerced employees in violation of Section 8(c) of the Act is not supported by substantial evidence. The ALJ specifically found "President Iorio's lengthy speech does not contain any explicit threats to the employees' jobs at the Company's Oscoda, Tawas City and East Tawas plants if the employees selected the Union to represent them." He then found "that this speech about the 'viability' of the three plants—particularly in the context of the Company's other speeches, literature, and conduct—was a veiled prediction of job losses from strikes, job transfers, or plant closure." He did not find that any other speech or literature contained an unlawful threat. What he found was that literature distributed by the company consisting of newspaper articles about strikes at other ITT plants suggested that if the union won the election there could be strikes at the three Michigan plants.

The employer did not say the union would call a strike or that it would refuse to bargain. Rather, Iorio stated the company would bargain but bargain hard. While ITT noted that jobs had been transferred to Mexico in the past, it also noted that these three plants had expanded and would continue to expand. While plant closures were mentioned by Bob Dawles, it was in the context that ITT would close plants if they became unprofitable and had closed plants that became unprofitable. Finally, the ALJ found that ITT's statement in a four-page flyer (J.A. 478) that it would not give in to unreasonable demands and, "the only thing [the union] could do about it is strike," was coercive. The flyer also stated the company would bargain in good faith but it would bargain very hard and that there was no guarantee that the employees would end up with as good a

wage and benefit package if they voted for the union. The ALJ found that these statements constituted a threat that the company might regard any proposed improvement in the benefit package to be an unreasonable demand. The company did not say that. As we stated in *NLRB v. Pentre Electric, Inc.*, 998 F.2d 363, 369 (6th Cir.1993):

> Because "the only effective way of arguing against the union is for the company to point out to the workers the adverse consequences of unionization, ... it is often difficult in practice to distinguish between lawful advocacy and threats of retaliation." *NLRB v. Village IX, Inc.*, 723 F.2d 1360, 1367 (7th Cir.1983). In *Gissel Packing*, 395 U.S. at 616–20, 89 S.Ct. at 1941–43, the Supreme Court examined the scope of section 8(c)'s protection and the interplay of that section with section (1) in an attempt to draw the line between lawful and unlawful employer speech more clearly. The court noted that "[a]n employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a 'threat of reprisal or force or promise of benefit.'" *Id.* at 618, 89 S.Ct. at 1942. Moreover, the court stated that an employer "may even make a prediction as to the precise effects he believes unionization will have on his company." *Id.*

ITT did not predict that the union would make unreasonable demands but only pointed out a possible consequence, i.e., strike, if it did. It could point out that any contract with the union might be no better than the employees' present wages and benefits. There is no "threat of reprisal" by predicting an uncertain future. This was nothing more than predictions of possible consequences. There was no threat to close the plant if the union won the election or desire to punish employees for a pro-union vote. There was no "threat of reprisal."

394

The ALJ also found the fact that supervisors standing on the plant floor could observe employees voting 60 to 80 feet away and up a stairway was coercive. The employees were voting in an office that was on a mezzanine above the plant floor reached by a stairway against the wall. From most locations in that particular building one could see who was in line to vote. There is no suggestion that the supervisors could hear anything said by the prospective voters. Relying on *Performance Measurements Co.*, 148 NLRB 1657, 1964 WL 16318 (1964), a case in which the employer stood within six feet of the polling place, the ALJ found that this observation was coercive and constituted *intimidation within the polling place.* During the relevant time period, the plant continued its normal operations. The location of the management personnel on the plant floor could be explained by the fact that some were unable to use their offices due to the proximity of their offices to the voting location. Management was as interested in a large voting turnout as the union. Thus, the mere fact that management knew an employee had voted cannot support a finding of intimidation in the polling place.

Because there are other statements and conduct that do support the Board's conclusion, I would remand the matter to the Board to determine whether the remaining statement and conduct was sufficiently coercive to warrant the remedy of a second election.