Board has meet the three factors established by our court to review a bargaining order, we find that the Board's bargaining order was properly issued. *See V & S ProGalv*, 168 F.3d at 286 (stating that "because the Board supported its reason for the bargaining order by citing to the violations made by [the employer], which were supported by testimony and facts, the Board's remedy should not be disturbed").

### IX.  Conclusion

In sum, the Board's determination of the violations of the NLRA is upheld and the Board's petition for enforcement of the Union certification is GRANTED and the Board's petition for enforcement of the bargaining order is GRANTED.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0260P (6th Cir.)
File Name: 00a0260p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

NATIONAL LABOR RELATIONS BOARD,

*Petitioner,*

SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION OF NORTHERN OHIO LOCAL UNION NO. 33,

*Intervenor,*

v.

GENERAL FABRICATIONS CORPORATION,

*Respondent.*

Nos. 99-6133; 00-1108

On Application for Enforcement of an Order of the National Labor Relations Board.
Nos. 8-CA-29443/29444/29445/29446/29507/ 29520/29591/29728/29756/29820/31000; 8-RC-15667.

Argued:  May 5, 2000

Decided and Filed:  August 1, 2000

Before:  ENGEL, JONES, and COLE, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Timothy C. McCarthy, SHUMAKER, LOOP & KENDRICK, Toledo, Ohio, for Respondent. Andrew J. Krafts, NATIONAL LABOR RELATIONS BOARD, APPELLATE COURT BRANCH, Washington, D.C., for Petitioner. Richard P. James, ALLOTTA & FARLEY, Toledo, Ohio, for Intervenor. **ON BRIEF:** Timothy C. McCarthy, SHUMAKER, LOOP & KENDRICK, Toledo, Ohio, for Respondent. Andrew J. Krafts, Aileen A. Armstrong, Frederick C. Havard, NATIONAL LABOR RELATIONS BOARD, APPELLATE COURT BRANCH, Washington, D.C., for Petitioner. Richard P. James, Michelle T. Sullivan, ALLOTTA & FARLEY, Toledo, Ohio, Craig Becker, Chicago, Illinois, for Intervenor.

———————————

## OPINION

———————————

R. GUY COLE, JR., Circuit Judge. The National Labor Relations Board (NLRB or Board) petitions for enforcement of two orders against General Fabrications Corporation ("Company"). First, the NLRB petitions for enforcement of a bargaining order against General Fabrications, which was issued after a finding that the Company violated §§ 8(a)(1), (3) and (5) of the National Labor Relations Act ( NLRA), 49 Stat. 452, 453, as amended, 29 U.S.C. §§ 158(a)(1), (3) and (5), by dismissing and laying off employees and by statements made by management during and after a union organizing campaign by the Sheet Metal Workers' International Local 33 (Union). Second, the NLRB petitions for enforcement of an order against General Fabrications finding that the Company violated §§ 8(a)(1) and (5) of the NLRA by refusing to bargain with the Union. We ENFORCE both of the Board's orders.

considering the nature and quantity of the unfair labor practices committed by the Company, which occurred even after the union election in this case. We agree with the Board that General Fabrications has committed the kind of unfair labor practices – including numerous uncontested violations of § 8(a)(1) and violations that effected the entire workforce – which may merit a bargaining order. *See V & S ProGalv, Inc. v. NLRB*, 168 F.3d 270, 286 (6th Cir. 1999) (finding that a bargaining order "was the proper remedy where the Board found several violations of § 8(a)(1) and, as such, the likelihood of ensuring a fair election was slight"). The presence of "hallmark" violations of the Act further supports the issuance of a bargaining order. "[W]e have adhered to a somewhat less rigorous specificity requirement where the Board has presented substantial evidence of so-called "hallmark" violations, such as disciplinary discharge of union activists or actual or threatened plant closure." *DTR Indus. Inc.*, 39 F.3d 106 at 113. In this case, the Company committed several hallmark violations. In the November 4 meeting, Boraski threatened not to bring any more work into the facility. This threat was then repeated by Garba. Also, Boraski made similar threats in different settings – such as the incident where he pulled out his keys and stated that he could close down the facility any time he wanted. Further, employees who supported the union were retaliated against. Mikolay, who admitted to Boraski that he had called the union in, was disciplined and suspended in violation of the Act; violations unchallenged by the Company on appeal. Three of the other four employees who signed union cards at the first meeting were either permanently laid off or discharged. The Company committed violations of the NLRA against four of the seven who signed union cards at the second meeting, including three layoffs. *See Indiana Cal-Pro*, 863 F.2d at 1301 (upholding a bargaining order where the Board "relied on the relatively small size of the bargaining unit, the level of management involved, and the extensive and egregious unfair labor practices committed by the Company"). In light of the deference due to the Board's determination of the appropriate remedy, and our review which shows that the

Section 8(a)(1) violations; and (3) a fair election cannot be had under the circumstances of the case. *See Taylor Machine*, 136 F.3d at 518-19; *Indiana Cal-Pro, Inc. v. NLRB*, 863 F.2d 1292, 1300 (6th Cir. 1988).

In this case, the first requirement was met – the Union obtaining authorization cards from eighteen of the thirty-one unit employees.

We believe that the Board has satisfied the second element as well. While this case presents the unusual situation in which the Union has, in the end, prevailed in the election, this does not bar the issuance of a bargaining order. *See Power Inc. v. NLRB*, 40 F.3d 409, 423 (D.C. Cir. 1994); *Eddyleon Chocolate Co.*, 301 N.L.R.B. 887, 892 (1991); *The Holding Co.*, 231 N.L.R.B. 383 (1977); *Pope Maintenance Corp.*, 228 N.L.R.B. 326, 347-48 (1977), *but see Demi's Leather Co.*, 321 N.L.R.B. 966 (1996) (deferring ruling on a recommended bargaining order until the challenged ballot was counted). The Board has shown that the Union's support was significantly diminished as a result of the Company's unfair labor practices. After the November 4 staff meeting and the termination of several pro-union employees, attendance at union meetings dwindled to one or two people, and employees rebuffed organizer efforts to contact them. While the Union obtained twelve authorization cards in a matter of days before these actions, it took a month to obtain the remaining union authorization cards after the actions. Further, the ALJ credited testimony by union organizer Matt Oakes that on November 3, Montgomery, who had signed a union authorization card, contacted Oakes and requested that his card be destroyed, stating that "he couldn't afford to lose his job, and that he didn't feel that the Union would benefit or be good for him or the Company." The combined effect of these actions tended to undermine the majority's support for the Union.

Third, the Board sufficiently shows that a fair election cannot be held under all the circumstances of the case,

## I.  Factual background

Company president and owner Charles Boraski founded General Fabrications, a small company that manufactures and installs industrial equipment, in 1982. As of October 1997, the Company employed 31 non-supervisory employees at its Sandusky, Ohio facility. At that time, in Plant One, about eight employees made components, such as electrical panels and oven panels, which were then assembled in Plant Two, where about sixteen employees worked and where the main management offices were located. The remaining employees spent their time in the field installing and maintaining the Company's equipment.

In October 1997, employee Frank Mikolay contacted the Union. The first union meeting was held on October 29, 1997 by union organizer Matt Oakes. Five employees – Mikolay, Ed Collins, James Roberts, Davin Jones, and Chris Wade – attended and signed union authorization cards. A sixth employee – Terry Trushell – attended but did not sign an authorization card. The employees were given union flyers to distribute at their workplace. On October 31, a second union meeting was held. Seven employees who had not attended the first meeting – Bryan Cloud, John Johnson, Ron Fields, Jeremiah Pitts, Gerald Rahm, Bill Harvey, and Bill Montgomery – attended, signed union authorization cards, and were given union literature.

Within a week of the first union meeting, the Company took action against six employees. On October 30, Jones, who had attended the first union meeting, was terminated, allegedly for absenteeism. On November 3, Collins and Roberts, who at the time were building oven panels, were permanently laid off, allegedly due to the cost of producing these panels. On November 4, Mikolay's table was moved closer to his supervisor's office. Mikolay was also subjected to isolation and monitoring.

Also on November 4, General Fabrications held a company-wide meeting. At the meeting, which Mikolay taped, Boraski stated that he was receiving threats and that the work orders that he had would not be made in Sandusky because he would not succumb to these threats. Robert Garba, the company's general manager, spoke after Boraski, stating that whether or not the company shut down depended on how "reliable" employees were.[1] Later that same day, Cloud, an electrician's helper, and Johnson, an electrician, were laid off, allegedly because of a lack of work for these employees.

On November 17, the employees who had been discharged or laid off formed a picket line in front of the Company. Mikolay, Jeremiah Pitts, Gerald Rahm, and Ron Fields visited these men on the picket line. Ron Fields was laid off on December 2, 1997, leaving only one electrician, Thomas Searcy, at the Company. Fields was recalled in February 1998 when Searcy quit.

By December 4, 1997, the Union had obtained authorization cards from 18 of the 31 unit employees. The Union requested voluntary recognition from the Company. When the Company rejected the request, the Union filed a petition for representation with the NLRB.

---

[1] Garba: What happens here I guess depends on what everybody in this room does. Whether the work is brought in here or if we all have jobs. I want to work here. I've got over ten years in this company. I want to stay here, I want to retire from this company. I don't know how everybody else feels, but that's really important to me, stability . . . .
Mikolay: Hold on real quick, I've got something I'd like to bring up real quick. We're not going to be bringing no more jobs in here?
Garba: No.
Mikolay: So we're shutting down? That's basically what you're saying?
Garba: That depends on everybody here. That depends on how productive we are, ah, how reliable we are.
Joint Appendix (J.A.) at 114.

status ("Category I" cases); or "less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes" and the union has shown majority support ("Category II" cases). *Id.* at 613-14. The Board held that General Fabrications's conduct fell at least within Category II. In Category II cases:

> [T]he Board can properly take into consideration the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future. If the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order, then such an order should issue.

*Id.* at 614-15. A bargaining order should not issue if the employer has committed "minor or less extensive unfair labor practices" that have a "minimal impact on the election machinery." *Id.* at 615. We review the Board's issuance of a bargaining order for an abuse of discretion. *See NLRB v. Taylor Machine Prods., Inc.*, 136 F.3d 507, 519 (6th Cir. 1998).

The Board, in Case No. 99-6133, issued a bargaining order as a remedy for the unfair labor practice charges. One Board member dissented, arguing that the Board should not issue a bargaining order until the results of the first election were clear. This has now occurred, and the ballots indicate that the union won the election.

In order for us to enforce a bargaining order, the Board must show that (1) the Union has obtained authorization cards from the majority of employees in the bargaining unit without unfair practices or misrepresentation; (2) the employer has dissipated the Union's majority through the commission of

practices, the Board's Order is entitled to summary affirmance. *See NLRB v. Autodie Int'l, Inc.*, 169 F.3d 378, 381 (6th Cir. 1999); *NLRB v. Valley Plaza, Inc.*, 715 F.2d 237, 240-41 (6th Cir. 1983). These "uncontested violations . . . 'do not disappear altogether. They remain, lending their aroma to the context in which the contested issues are considered.'" *NLRB v. Talsol Corp.*, 155 F.3d 785, 793 (6th Cir. 1998) (quoting *NLRB v. Champion Laboratories, Inc.*, 99 F.3d 223, 227 (7th Cir.1996)).

## VII.  Failure to bargain.

This court has determined that the Board's findings that Jones was unlawfully terminated and that Collins and Roberts were unlawfully permanently laid off are supported by substantial evidence. Therefore, the votes of the challenged ballots – those of Jones, Collins, Roberts, and a fourth employee, who was determined to be a unit employee, not a supervisor – were properly included in the election tally. This corrected  tally resulted in a union victory by a vote of 16 - 15. The Board properly certified the Union as the collective bargaining representative of this unit and the Company's failure to bargain after the Board certified the Union is an unfair labor practice. We ENFORCE the Board's order in Case No. 00-1108.

## VIII.  Bargaining order.

In general, "[a]n election is the preferred method of determining the choice by employees of a collective bargaining representative." *United Servs. for the Handicapped v. NLRB*, 678 F.2d 661, 664 (6th Cir. 1982). The Board may, in some circumstances, issue an order requiring an employer to bargain with the union as an alternative remedy for employer unfair labor practices. *See Gissel Packing Co.*, 395 U.S. 575. The Board is within its discretion to issue a bargaining order either "in 'exceptional' cases marked by 'outrageous' and 'pervasive' unfair labor practices," whether or not the union has established majority

During the campaign leading up to the union election, Boraski held several Company meetings. Gerald Rahm, a unit employee, testified at a later hearing that Boraski told employees that they would be forced to work for less than they already had. Further, Pitts testified that Boraski told the employees that negotiations would start from ground zero, and the employees would work under the rate he set. In addition, Company literature distributed during the campaign stated that employees, if unionized, would have to follow Company rules "to the letter."

Thirty-one ballots were cast in the representation election held on January 20, 1998. The union lost by one vote: 14 - 13. Four ballots were challenged. The Company challenged the ballots of Davin Jones, James Roberts, and Ed Collins; the Union challenged the ballot of Kyle Perkins, alleging that Perkins was a supervisor and, therefore, not an eligible unit member.

## II.  Procedural history

On May 6, 1998,[2] a consolidated complaint was issued that alleged various violations of Section 8(a)(1) of the NLRA,[3] violations of Section 8(a)(3) of the NLRA[4] for discrimination

---

[2]Unfair labor practice charges were filed from November 1997 to April 1998, and were consolidated in the May 6, 1998 complaint.

[3]"It shall be an unfair labor practice for an employer–
    (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;"
29 U.S.C. § 158(a)(1).

[4]"It shall be an unfair labor practice for an employer–
    (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . .;"
29 U.S.C. § 158(a)(3).

against two employees and the dismissal of five employees, and violations of Sections 8(a)(3) and 8(a)(4)[5] for the suspension and termination of a sixth employee. The complaint also alleged a violation of Section 8(a)(5) of the NLRA[6] for the Company's failure to recognize the Union. The Union requested that the remedy include a bargaining order.

After a hearing, an administrative law judge ("ALJ"), in a detailed decision issued September 17, 1998, found numerous violations of the NLRA, some of which relied on credibility determinations. The ALJ found that (1) the Company violated Sections 8(a)(1) and 8(a)(3) of the NLRA by discharging Jones, permanently laying off Collins and Roberts, laying off Johnson, Cloud, and Fields, and suspending Mikolay; (2) the Company violated Section 8(a)(1) of the NLRA by its actions during the union campaign, such as threatening loss of jobs and plant closure, and harassing employees who supported the union; and (3) the Company violated Sections 8(a)(1) and 8(a)(5) of the NLRA by refusing to recognize and bargain with the union since December 4, 1997. The ALJ found that a bargaining order was an appropriate remedy.

The Board, in an order issued August 5, 1999, found that the Company had committed the unfair labor practices found by the ALJ. The Board upheld the ALJ's credibility determinations, the ALJ's findings of fact, and conclusions of

---

[5] "It shall be an unfair labor practice for an employer–
(4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter;"
29 U.S.C. § 158(a)(4).

[6] "It shall be an unfair labor practice for an employer–
(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."
29 U.S.C. § 158(a)(5).

---

N.L.R.B. 377 (1985). In *Tri-Cast*, the employer's letter stated in part: "2. We have been able to work on an informal and person-to-person basis. If the union comes in this will change. We will have to run things by the book, with a stranger, and will not be able to handle personal requests as we have been doing." 274 N.L.R.B. at 377. The Board found that the employer did not threaten improper discipline when it stated that the relationship between it and the employees would change.

Substantial evidence exists to support the Board's finding that the Company's statement violated the NLRA. The letter in this case not only describes a change in the relationship between employer and employee in case of unionization, it also threatens workers with changes in work rule enforcement if they unionize. *See United Artists Theatre Circuit, Inc.*, 277 N.L.R.B. 115, 121 (1985). As the Board stated in *United Artists Theatre*:

Such a threat is not in any way a prediction of consequences of bargaining or the result of an agreement with the Union. Rather it is a simple threat to diminish, however slightly, the quality of employee working conditions should the employees select the Union. Such a statement cannot but effect employee sentiment regarding the decision to support or oppose the Union.

*See also NLRB v. McClain of Georgia, Inc.*, 138 F.3d 1418, 1426 (11th Cir. 1998) (finding that increased enforcement of formerly lax disciplinary rules or selective enforcement of disciplinary rules will be upheld as unfair labor practices).

## VI. Uncontested violations.

General Fabrications does not address or take issue with the Board's conclusions regarding a number of violations of § 8(a)(1) and a violation of § 8(a)(3). As a result, the Company has "effectively admitted the truth of those findings." *NLRB v. Kentucky May Coal Co.*, 89 F.3d 1235, 1241 (6th Cir.1996). With regard to these unfair labor

J.A. at 495.

An employer's statement that after unionization bargaining will begin "from scratch" can be coercive, and therefore a violation of § 8(a)(1), depending on the context of the statement. *See TRW-United Greenfield Div. v. NLRB*, 637 F.2d 410, 420 (5th Cir. 1981). Coercive statements are those which indicate that the employer will adopt a regressive bargaining stance or lowered benefits to penalize workers for unionization, and are viewed in the context of other statements or actions by the employer. *See id*. at 421. Given the statements that Boraski himself admits to making and the atmosphere of anti-union animus at the Company, the Board's finding is clearly supported by substantial evidence.

### D. Threats of discipline

General Fabrications also disputes the Board's finding that literature distributed by the Company before the union election constituted a threat to increase discipline if the employees unionized. The document at issue states that with or without a union, employees are required to:

> Come to work every day.
> Do a good job when you are here.
> Follow the company rules and procedures.
> *However*, with a union in addition to the above, you will be required to:
> Follow the company rules and procedures to the letter. . . .

J.A. at 135.

The Company asserts Section 8(c) as a defense to the unfair labor practice charge of unlawful threats or coercion. *See Gissel Packing*, 395 U.S. at 618; *ITT Automotive*, 188 F.3d at 385. Section 8(c) protects "views, argument or opinion, or the dissemination thereof, . . . if such expression contains no threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c). The Company also relies on *Tri-Cast Inc*., 274

law. Further, the Board ordered that the Company engage in bargaining with the Union. The NLRB applied for enforcement of the Board order in this court (Case No. 99-6133).

Following the Board's decision, the four contested election ballots were opened. Counting these ballots, the union won the election by a vote of 16-15. A certification of representation was issued on August 13, 1999. In order to challenge the inclusion of the three former employees in the election tally, the Company refused to bargain with the Union, and a resulting unfair labor practice charge was filed against the Company. The NLRB moved for summary judgment against the Company on this charge, which the Board granted on December 30, 1999. The NLRB petitioned this court for enforcement of its order. This case (Case No. 00-1108) was consolidated with the case already pending for our consideration.

### III.  Standard of review

The findings of the Board or its ALJ will not be disturbed by this court if they are supported by substantial evidence. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 491 (1951). Substantial evidence exists when, on the record as a whole, evidence is "adequate, in a reasonable mind, to uphold the [Board's] decision." *Turnbull Cone Baking Co. v. NLRB*, 778 F.2d 292, 295 (6th Cir. 1985). This court must review evidence in the record that runs contrary to the Board's decision. *See NLRB v. Pentre Elec., Inc*., 998 F.2d 363, 368 (6th Cir. 1993). It is, however, the "Board's function to resolve questions of fact and credibility." *Roadway Express Inc. v. NLRB*, 831 F.2d 1285, 1289 (6th Cir. 1987) (quoting *NLRB v. Baja's Place*, 733 F.2d 416, 421 (6th Cir. 1984)). We, therefore, "ordinarily will not disturb credibility evaluations by an ALJ who observed the witnesses' demeanor." *Roadway Express*, 831 F.2d at 1289. This is particularly true "where the 'record is fraught with conflicting testimony and essential credibility determinations have been

made.'" *ITT Automotive v. NLRB*, 188 F.3d 375, 384 (6th Cir. 1999) (quoting *Tony Scott Trucking, Inc. v. NLRB*, 821 F.2d 312, 315 (6th Cir. 1987)). Finally, we must uphold the Board's findings if supported by substantial evidence even if "the court would justifiably have made a different choice had the matter been before it de novo." *Universal Camera*, 340 U.S. at 487-88.

## IV.  Terminations and layoffs

In deciding § 8(a)(3) cases in which the employee was allegedly retaliated against for his union activity, but the employer alleges that it was motivated by legitimate reasons, the NLRB must first establish a prima facie case by putting forth evidence that supports an inference that the employee's protected activities were a motivating factor in the employer's decision. *See Wright Line*, 251 N.L.R.B. 1083 (1980); *see also NLRB v. Transportation Management Corp.*, 462 U.S. 393, 394-95 (1983) (adopting the *Wright Line* test). In an alleged § 8(a)(3) violation, the general counsel must put forward evidence that the employee was engaged in protected activity; that the employer knew of the employee's protected activity; and that "an adverse employment action resulted in whole or in part from anti-union animus, or 'that the employee's protected conduct was a motivating factor in the adverse action.'" *ITT Automotive v. NLRB*, 188 F.3d 375, 388 (6th Cir. 1999) (quoting *Transportation Management Corp.*, 462 U.S. at 401). Anti-union sentiment can be shown through direct or indirect evidence. *See id.* at 389.

Discriminatory motivation may reasonably be inferred from a variety of factors, such as the company's expressed hostility towards unionization combined with knowledge of the employees' union activities; inconsistencies between the proffered reason for discharge and other actions of the employer; disparate treatment of certain employees compared to other employees with similar work records or offenses; a company's deviation from past practices in implementing

spoke with Boraski. The ALJ credited Rahm's testimony regarding the discussion. Rahm stated that during that meeting, Trusdell spoke out against the union. Rahm expressed concern about his job. Rahm stated that Boraski responded by taking out a set of keys, holding one up, and asking Rahm if he knew what it was. Rahm said it was a key. Boraski asked "A key to what?" Rahm replied, "The building." Boraski stated, "That's right, and I can close it and move it anytime I want to."

Boraski, on the other hand, testified that the meeting had taken place, but that he did not make the alleged statements. Trusdell did not testify.

As noted above, "[w]hen there is a conflict in the testimony, 'it is the Board's function to resolve questions of fact and credibility,' and thus this court ordinarily will not disturb credibility evaluations by an ALJ who observed the witnesses' demeanor." *Turnbull Cone*, 778 F.2d at 295 (quoting *NLRB v. Baja's Place*, 733 F.2d 416, 421 (6th Cir.1984)). The Company does not provide this court with a reason to disturb the ALJ's credibility findings and the determination that Boraski's statement violated § 8(a)(1) of the NLRA in this instance.

### C. Bargaining from scratch

The Board found that the Company violated § 8(a)(1) by stating that any negotiations would begin at zero. In his testimony before the ALJ, Boraski alleges that he said that employees could obtain more or less in wages and benefits than they currently had. While he does indicate that he put out a memo to this effect, he also testified that, in meetings with employees:

I said that collective bargaining, whenever you bargain with the Union, you start – you start at zero, you don't start where you're at right now, you don't start with you existing wages, you don't start with you existing benefits, you start at zero.

people know what I'm talking about. If you don't want to work here the front door is right there and downstairs. If you don't want to work here and want another job, see me. I will help you find a job. I've got many contacts in Sandusky. I'll be more than happy to help you get another job. But I will not succumb to a threat of any kind or from anybody. We got new projects, orders for projects. These projects will not be built in Sandusky, Ohio, as of this point in time, they will not. Any future orders will not be built in Sandusky, Ohio. I will not succumb to a threat of any kind from anybody.

J.A. at 113. The ALJ found that Boraski's assertion that he was discussing a physical, as opposed to an economic "threat" of unionization, during the meeting was not credible, and rejected the Company's assertion that it did not know of the union activity at the time. The Board upheld the ALJ's determination that the statement constituted a threat of plant reduction or closure in violation of Section 8(a)(1).

An employer's threat to close down if the company unionizes is a "hallmark" violation of the NLRA. *Indiana Cal-Pro, Inc. v. NLRB*, 863 F.2d 1292, 1301 (6th Cir. 1988). Boraski's statement was not a factual prediction about the likely future; *i.e.*, a statement that would not violate Section 8(a)(1). *See DTR Indus., Inc. v. NLRB*, 39 F.3d 106 (6th Cir. 1994). His statements at the meeting that no jobs would be done in Sandusky unless the "threats" stopped, and his reference to being able to close the building do not indicate actions taken for economic necessity or economic factors beyond his control. *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969). The Board's determination that the comments violated § 8(a)(1) of the NLRA is supported by substantial evidence.

### B. Threats of plant closure

On a Sunday in November, employees Gerald Rahm, who supported the union, and Terry Trusdell, who opposed it,

the discharge; and proximity in time between the employees' union activities and their discharge.

*W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 871 (6th Cir. 1995) (citing *Turnbull Cone Baking Co. v. NLRB*, 778 F.2d 292, 297 (6th Cir.1985)). The burden then shifts to the Company to prove by a preponderance of the evidence that it would have taken the same action against the employee in the absence of protected activity. *See NLRB v. General Sec. Servs. Corp.*, 162 F.3d 437, 442 (6th Cir. 1998) (citing *Transportation Management Corp.*, 462 U.S. at 394-95).

As an initial matter, the Company contends that it was unaware of union activity until November 5 or 6, therefore, retaliation for union activity did not motivate the termination of Jones on October 30, the permanent layoffs of Collins and Roberts on November 3, or the temporary layoffs on November 4. The ALJ, however, found that the Company was aware of union activity by October 30. This finding is supported by substantial evidence. The first union meeting was held October 29. The next day, employees who had attended the meeting brought brightly colored union flyers into their workplace, left them in plain view, and handed them to co-workers. In addition, several employees testified to discussing the union with others on October 30. In a small company, with a "hands-on" president, and where supervisors frequently walk around the facility, these facts support the inference that Company management knew of union activity on October 30.

### A. Termination of Jones

Davin Jones began working at General Fabrications on September 15, 1997 as the highest paid welder/fabricator. Before starting with the Company, he was a fabricator and welder in Michigan. At a company meeting in September, Boraski stated that he could use more employees like Jones, according to the testimony of Jones and other employees, which was credited by the ALJ. Boraski acknowledges

making a similar comment, but denies that he singled Jones out for praise. Jones was terminated on October 30, 1997.

The Company argues that the only evidence of Jones's union involvement was his own exaggerated testimony and that Jones was properly terminated for absenteeism, not because of anti-union animus. We believe that the ALJ's determination that absenteeism was a pretext for terminating Jones for union activity is supported by substantial evidence.

First, the ALJ properly inferred that the Company was aware of Jones's union activity. Jones clearly signed an authorization card at the first meeting and testified that he put union flyers on top of his welder in the shop and spoke with a few employees regarding the union. In addition, Jones testified that Terry Trushell, the employee who had attended the first union meeting but did not sign an authorization card, had a discussion on October 30 with General Manager Robert Garba and that the two were looking at him; facts from which the ALJ inferred that the Company was aware of Jones's protected activity.

Second, substantial evidence supports the determination that Jones's termination was motivated by anti-union animus, not Jones's alleged absenteeism. General Fabrications alleges that from his start on September 15 to his termination on October 30, he was late twice and left work early four times. Jones testified, however, that on these occasions, he either had permission from Garba, or left early with other employees, as occurred when no supervisor or foreman was there, and that he would get a ride home with his coworkers because his wife drove him to and from work. Further, Jones did not receive a warning or any notice that his attendance was a problem.

On October 30, when Jones asked why he was being terminated, Garba told him it was for absenteeism. Jones's supervisor had asked Jones to work overtime the following weekend, however; a fact from which the ALJ inferred that

contractor to manage the installation of a project for the Company.

The Company suggests that layoffs were almost a yearly occurrence. However, Kath, who stated that layoffs had occurred in the past, also said that the most recent he could remember was four years earlier. Boraski stated that the fall of 1996, the year before the organizing campaign, was terrible for the department, however he conceded that employees in the department were kept on the payroll and not laid off. *See ITT Automotive*, 188 F.3d at 388 (stating that an employer's deviation from past practices supports an inference of anti-union animus).

The deference given to the ALJ's credibility findings and other factual findings leads us to find that substantial evidence exists to support the Board's determination that these three were laid off in violation of Sections 8(a)(1) and 8(a)(3).

## V.  Section 8(a)(1) violations.

### A. November 4, 1997 employee meeting

In the November 4 company meeting taped by Mikolay, Boraski stated, in part:

Myself and my family have been threatened, and I am going to tell you right now I will not succumb to threats from anybody. I apologize to the employees who are here and shouldn't be here, who are here every day, work hard, trustworthy, dependable, please accept my apology. When you hired in, whoever interviewed you, you said that you would work, you wanted a job, that you would work, be here every day, work hard, we said we would pay you this much, you said fine, we said fine. This is what you call an at will employment. That at will employment is that you can leave at any time and we can dismiss you at any time. In the past eight to eleven months, our attendance is the worst in Sandusky, our work ethic has dropped after a lot of years, you older

signed union cards. Searcy allegedly stated that it was not a good idea and headed towards Plant 2, where the management offices were located. From this testimony, the ALJ inferred that Searcy told management of these employees's union activities.

The Company also argues that it needed to layoff electricians due to a seasonal, cyclical downturn, therefore, the employees were not laid off because of retaliation. As of November 4, these employees were consistently working full weeks and overtime. Kath and Boraski downplayed the work done before the layoffs as indirect, "busy work." As the ALJ stated, "I am satisfied that Respondent would not have paid overtime to electricians for 'busy work.'" Joint Appendix ("J.A.") at 22.

Cloud stated that after the company meeting on November 4, when Boraski stated that he was not bringing jobs into the shop because he would not succumb to threats, Cloud approached Kath, worried about his job. Cloud testified that Kath told him that he had plenty of work for them. Further, Cloud testified that when he was laid off later that day, Kath did not mention a downturn in work. Instead, Kath told him that Boraski said that he would not bring more work into the shop until the threats stopped. Kath stated, according to Cloud, that "both sides were butting their heads, both sides are flexing their muscles right now. . . . Let's let everything cool down, and I'll have you back in here in two weeks." The ALJ relied on this testimony to determine that Cloud and Johnson were not fired because of a downturn in production, but rather because the two were on the "wrong" side in the confrontation.

Further, there was some evidence that other employees stated that the electricians were needed and that the Company took other measures to complete its electrical work by having supervisors do work in the shop, having other employees help out, and hiring a retired former electrical supervisor as a

the supervisor had not been consulted about Jones's termination and that meaningful investigation into Jones's work record had not been made. Garba testified that he normally does not review employee time cards, but he stated that he did in this case and then wrote a memo on October 31, the day after Jones's termination. The ALJ found that Garba's review shows neither irregularities in Jones's attendance, nor unexcused absences. Further, the memo does not show that Jones was absent on October 25, a fact to which Garba testified before the ALJ. In sum, there is substantial evidence to support the Board's finding that the company had a discriminatory motive in light of the timing of the termination, Garba's false testimony, and the anti-union animus shown by the Company at its November 4 meeting. *See, e.g., W.F. Bolin Co.,* 70 F.3d at 872 (stating that the proximity in time between the protected activity and layoff supported an inference of improper employer motivation).

### B. Permanent layoff of Collins and Roberts

Ed Collins responded to an advertisement in the Sandusky Register newspaper for a welder/fabricator position and was hired December 23, 1996. He was first assigned to manufacturing, then was moved to oven panel production in Plant 1. In April 1997, he became lead man for oven panel production. James Roberts was hired June 9, 1997 after responding to a Sandusky Register ad. Before coming to the Company, he had worked at Sandusky Cabinets for 15 years. He started as a shear operator, then moved to oven panel fabrication. Both Collins and Roberts attended the first union meeting on October 29, signed union authorization cards, and took union literature. Collins left the literature on his work table and discussed the union with other employees. Roberts put the handouts in his lunch box, but testified that he talked to, at least, Harvey and Johnson regarding the meeting the night before. On November 3, both men were told by supervisor Mike Belch not to make any more panels that day. At the end of the day, they were permanently laid off. The Company had never permanently laid off an employee before.

The Company alleges that Collins and Roberts were fired due to the Company's decision to stop production of oven panels because of the cost of producing the panels. The Company began producing the panels in 1994. At the hearing before the ALJ, the Company did not present any cost-related figures and Boraski stated that he did not know the cost per panel of production. Nonetheless, the Company states that a target daily production was twelve to fifteen panels; and that panel production had declined to an unprofitable level by October 1997, so that in November, the Company decided to abandon oven panel production. The ALJ found that the record did not establish that the Company monitored declining levels of production, and did not discuss the need to make more panels with Collins or Roberts. To arrive at its decision, the ALJ relied on testimony from Collins and Roberts that they were not told that they needed to make more panels, and testimony that oven panel production was dependent on other employees' parts production.

General Fabrications also alleges that both Collins and Roberts were hired as laborers and were not qualified to be welder/fabricators given their lack of welding skills and, therefore, could not have been given other work instead of being laid off. The ALJ noted that both men were paid similarly to welder/fabricators at the Company and that they were paid more than laborers. Both men had some prior welding experience: Roberts's file contained a recommendation letter from Sandusky Cabinets that he worked on its welding line, and Collins's file contained three certifications of welding training. The oven panel position required some welding, although the Company stated that it was not the same type of welding needed for other positions at the facility. Further, at least some oven panels were built after the two were terminated. Finally, ads similar to those Collins and Roberts had responded to were placed by the Company in the Sandusky Register from November 1 to November 4, after their layoffs.

Given the evidence of anti-union animus, these employees' qualifications, and the Company's inability to support its assertion that the layoffs resulted from unprofitable panel production, *see W.L. Bolin Co.*, 70 F.3d at 874, we find that substantial evidence exists to uphold the Board's determination that the Company fired Collins and Roberts because of anti-union animus, in violation of Section 8(a)(3), and that the Company failed to make its affirmative defense that it would have taken the same action absent protected activity.

### C. Layoff of Johnson, Cloud, and Fields

Bryan Cloud started on March 7, 1997 as an electrician assistant. He was hired by Arnold Kath, a family friend who was the electrical engineering manager at the Company. Electrician Ron Fields was hired on June 18, and electrician John Johnson was hired July 28, 1997. The third electrician, Thomas Searcy, had been at the shop the longest. On November 4, 1997, Johnson and Cloud were laid off. Fields was laid off on December 2, 1997, but was recalled in February when Searcy quit. Neither Johnson nor Cloud was recalled. We find that substantial evidence supports the Board's determination that the layoff of these employees was motivated by anti-union animus.

Cloud and Fields stated that, at the September company meeting, Boraski said that business was good and that it was a good time to "buy a car." Cloud, Fields, and Johnson attended the second union meeting on October 31 and signed union authorization cards.

The Company first challenges that it knew of these employees' protected activity. The ALJ credited Fields's testimony that ill-will existed between Searcy and the others, because Searcy had been suspended for shoving Cloud, and that after the November 4 company meeting Searcy asked Fields and Johnson, with Cloud present, if they had attended meetings. Fields told him that they had and that they had